JOHN PRICE *vs.* STATE OF MARYLAND.—*December*, 1849.

Where a criminal case is removed to an adjoining county for trial, under the act of 1804, ch. 55, it is sufficient to send a *transcript of the record* to the court to which the cause is removed. The original papers on file in the court, ordering the removal, need not be transmitted with the record, or as the record of proceedings.

The words of the record, "whereupon, let a jury thereon appear before the court, immediately by whom, and so forth," state the *venire* for the the petit jury, and the expression, "ten of which said jurors being called come, and so forth," refers to the impannelling, electing, and trying of the individual jurors, and not to the *venire*.

The proceedings in relation to the petit jury, being gone over in the court to which the cause is removed, any irregularity in such proceedings in

the court ordering the removal, would not be fatal, and no mention need be made of them in the transcript sent to the former court, except for the purpose of showing at what precise stage of the cause the removal was ordered.

The object to be effected by a removal is to secure a fair and impartial *trial*, and if the accused has been arraigned in the court where the cause originated, he need not be again arraigned in the court to which it is removed, the arraignment constituting no part of the *trial*.

The issue made by the accused putting himself upon the country for trial, does not contemplate any particular twelve individuals as the jury, as is manifest from the fact that the arraignment always takes place before the jury is sworn, and often at a previous term.

At common law, as a general rule, a jury must be returned from the county where the offence is committed, but our statute intercepts this rule in case of removals, and directs the issue to be tried by a jury from another county.

There are cases under the *English* statutes, in which, for the trial of offenders, a jury may be taken from a different county, but there is no difference in such cases in the mode of arraignment.

In removals from the King's bench, the *venire* in the indictment remains the same; the place of trial alone is changed.

The appeal to the accused "how will you be tried?" and his answer, "by my country," is a form handed down from the period when the party had the privilege of selecting a trial by jury, or by battle, and to put himself upon the country, was the formal mode of selecting a trial by jury.

In the removal of civil causes, it is not necessary to re-frame the issues in the county where they are removed.

The court to which a cause is removed, has no power to order a writ of diminution to correct the transcript of the record sent to it. Where diminution is suggested, the process should be applied for.

After the right of removal has been once exercised by either party, there can be no second removal. By the express terms of the act of 1805, ch. 65, sec. 49, and of 1809, ch. 138, sec. 20, the removal must be made by the court in which the *indictment is found, and none other*.

The city court of *Baltimore* is vested with all the powers, jurisdiction and authority formerly held and exercised by the court of oyer and terminer for *Baltimore* county, and has authority to remove a cause to an adjoining county for trial.

The court of oyer and terminer possessed, in respect to criminal jurisdiction within the city of *Baltimore*, all the general powers and authority which the several county courts possessed within their respective territorial jurisdictions, and remained unchanged by the amendment to the constitution of 1804, '5.

The county courts in this State, being the only courts of record with general common law jurisdiction, can rightfully exercise all the powers exercised by the court of King's bench in *England*, so far as those powers are

derived from rules and principles of the common law, and are suited to the change in our political institutions, and not modified by our constitutional or statutory enactments.

The power of removal, both of criminal and civil cases, is an acknowledged part of the ordinary common law jurisdiction of the courts of King's bench.

The privilege of removal was first made an object of constitutional security by the act of 1805, which left to the legislature no longer the power to deprive a party of its exercise, but only the power of extending it, or prescribing the *mode* of its exercise.

The practice of removing criminal cases from *Baltimore* city court has been continued since the act of 1805, and has been twice sustained by the Court of Appeals.

The same considerations must govern, and the same result is to be attained by a removal, both in regard to the State and the accused. There is no canon of interpretation which can be applied to the one, which will not apply with equal force to the other.

The object of the removal being to secure a fair and impartial *trial*, the case must be removed before the trial, or any part of it, is had in the court ordering the removal.

The trial can only be said to commence, within the contemplation of the law regulating removals, when the panel of twelve jurors is completed by being duly sworn.

Where a new trial is granted, or where the jury, unable to agree, are discharged, it then becoming necessary to try the case again, *de novo,* the second trial is as much a trial, within the contemplation of law, as the first was, before the party was put to the bar.

Error to *Anne Arundel* county court.

The record in this case states, that on the 22nd of October, 1849, *Baltimore* city court caused to be transmitted to *Anne Arundel* county court, for trial therein, *a transcript of their proceedings* in the case of the *State of Maryland against John Price,* lately depending in said city court, which said transcript is in the words, &c.

This transcript sets out a presentment by the grand jury of the city of *Baltimore,* against said *Price,* for the murder of *George Washington Campbell,* in the usual form, except the omission to state that said grand jury were duly impannelled and sworn.

Then follows the indictment, charging, in the usual form, said *John Price* with the wilful and felonious murder of

38    v.8

"*George Washington Campbell;*" and then proceeds to state the arraignment of the prisoner in the usual form, his plea of *not guilty,* his putting himself upon his country for trial, and the joining issue on the plea by the attorney general, in behalf of the State. After stating this arraignment, plea and issue, the transcript proceeds as follows:

Wherefore let a jury thereon appear before the court here, *immediately,* by whom, and so forth, and *ten of which said jury* being called, come, that is to say, (naming said ten;) who are severally elected, tried and sworn to say the truth of and upon the premises aforesaid. And afterwards, and before the completion of the said jury, the attorney general filed a suggestion, in writing, that the State cannot have a fair and impartial trial of said case in said court, and praying that the *record of their proceedings* in such prosecution be transmitted to the judges of some adjoining county court for trial, to be heard and determined by such county court, as if originally instituted therein. And the court accordingly ordered the *record of proceedings* of said cause to be transmitted to *Anne Arundel* county court, and then ordered the jurors, sworn as aforesaid, to be finally discharged, which was accordingly done.

Attached to this transcript is the certificate of the clerk of *Baltimore* city court, attested by the seal of said city court, that the foregoing "*transcript*" is a full and true record of the proceedings, &c.

The cause thus removed came on for trial in *Anne Arundel* county court, at its October term, 1849, when the prisoner, by his counsel, moved the court to discharge him without day, because it is manifest, from the record in this court filed, that he was, at September term, 1849, of *Baltimore* city court, put upon his trial, which trial was proceeded in until ten lawful men were called, selected, and sworn as jurors, to try the issue joined between him and the State; and that afterwards, said city court, against his consent, discharged the jurors so sworn without authority of law, so that he cannot again be put upon trial for the offence charged in the indictment set forth in said record. And he further alleged, in support of the above mo-

tion, that after the ten jurors were so sworn, said city court discharged them against his consent, and without authority of law; and without his consent, ordered and directed the *record of proceedings* of said city court, in said cause, to be transmitted to this court. So that this court hath no jurisdiction in this case, because the *record of proceedings* in said prosecution has not been transmitted thereto agreeably to the acts of Assembly in such case made and provided.

Which motion the court (DORSEY, C. J., and BREWER, A. J.,) overruled.

The prisoner, by his attorneys, then filed an affidavit, stating that the transcript of the record of proceedings from said city court was incomplete and diminished in this: that at the May term, 1849, of said city court, a presentment was made against him, charging him with the felonious homicide of *George Campbell;* and that, thereupon, the attorney general filed an indictment, charging him with the murder of said *George Campbell*, which the grand jury endorsed, "true bill;" that upon said indictment, he was arraigned, and plead not guilty, &c.; and that upon his application, the said indictment was continued to the next term of said city court, to wit: the September term of 1849. At which said last term, the grand jury made another presentment, charging him with the murder of *George W. Campbell*, and upon that presentment, the attorney general filed another indictment, charging him with the murder of the said *George W. Campbell*, which the grand jury also returned, endorsed "true bill." Upon said last indictment, he was also arraigned, and pleaded not guilty, &c., and the State joined issue, which a jury was called to try; that he was put to his challenges, and that the regular pannel being exhausted, *tales* were ordered, and summoned, and returned; and he further saith, that these two indictments were for one and the same homicide, and that the first is still on file in said city court, undisposed of, and that there is no mention made of the first indictment in said transcript, nor any mention that any tales were summoned, or any challenges made by him, or the State, and

allowed by the said court. But the court refused to grant a writ of diminution.

The prisoner then filed a suggestion and affidavit that a fair and impartial trial cannot be had in this court, where the said prosecution, as if originally instituted, is now depending, and prayed the court to direct the record of their proceedings to be transmitted to the judges of any adjoining county court, for trial, there to be heard and determined in the same manner as if the said prosecution had been originally instituted therein. Which the court refused to do.

The record then proceeds: And the said *John Price,* (in the custody of the sheriff of *Anne Arundel* county, as aforesaid,) who *had been heretofore, as aforesaid, placed at the bar of Baltimore city court,* as aforesaid, and had then and there been, as aforesaid, asked, how he, of the premises aforesaid, above against him, in form aforesaid imposed, as aforesaid, will acquit himself? had said, that he is *not guilty* thereof, and thereof, for good and evil, put himself upon the country, as aforesaid. And *George R. Richardson,* attorney general, as aforesaid, who prosecuted, as aforesaid, for the said State here, as aforesaid, in this behalf in like manner, and so forth, as aforesaid; therefore let a jury thereon appear, &c.

A jury was then sworn, and rendered a verdict "guilty of murder in the second degree." The traverser then moved in arrest of judgment, and assigned the following reasons:

1st. Because the transcript of the record filed in this court, is not a record of the proceedings in said prosecution, according to the act of Assembly.

2nd. Because said transcript is diminished, imperfect, repugnant and vicious.

3rd. Because he was not arraigned upon the indictment upon which he has been tried in this court, nor has he, in this court, plead to the said indictment, or joined issue thereon with the State.

4th. Because said proceedings have not been heard and determined in this court, as if such prosecution had been originally instituted therein.

5th. Because the court refused to order or grant the writ of diminution referred to in his affidavit.

6th. Because this court refused, upon his suggestion that he could not have a fair and impartial trial in said court, to direct the record of their proceedings to be transmitted to the judges of any adjoining county court for trial.

7th. Because this court had no jurisdiction to try said cause, said *Baltimore* city court having no authority to transmit the record of proceedings of said prosecution to the court here, for trial.

But the court overruled this motion, and passed sentence of confinement in the penitentiary, for fourteen years and six months, upon the traverser, who thereupon sued out the present writ of error.

The cause was argued before CHAMBERS, SPENCE, MAGRUDER, MARTIN, and FRICK, J.

By PRESTON and PITTS, for the plaintiff in error, and,
By GEORGE R. RICHARDSON, attorney general, for the State.

After argument, the attorney general filed a suggestion, in writing, stating that the transcript of the record sent from *Anne Arundel* county court to this court, is diminished in this, that in reciting the proceedings in *Baltimore* city court, the words " who being impannelled, sworn and charged to enquire for the State of *Maryland*, for the body of the city of *Baltimore*," are omitted in that part of the record which states the withdrawal of the grand jury to make the presentment, and that these words so omitted are contained in the transcript referred to in the record, as sent from *Baltimote* city court. He, therefore, prays for a writ of diminution to correct the record in this particular. This motion was submitted upon the statement by the attorney general, that the error was discovered after the argument of the cause at bar, and was not known when such argument was had. The court ordered the writ of diminution to issue, and the record was accordingly amended.

CHAMBERS, J., delivered the opinion of this court.

This case comes before us by a writ of error, prosecuted to bring into review the proceedings, which have ended in the conviction of the appellant of the crime of murder in the second degree, for which crime he has been sentenced to confinement in the penitentiary for fourteen years and six months. As the party is now in confinement pursuant to his sentence, we have used the very first moment after the case was fully submitted to us by his counsel, to examine into and confer upon the questions of law which his counsel have raised, and with great ability urged in argument. We have now to announce the result of our deliberations.

The offence is charged to have been committed in the city of *Baltimore*, within the jurisdiction of the "city court." In that court the indictment was found and proceedings thereon were had, as set forth in the record, when an application was made by the attorney general, on the part of the State, to remove the cause for trial to an adjoining county court. The cause was removed to *Anne Arundel* county court, where a conviction and sentence were had.

Various objections were urged against the proceedings, both in the city court and the county court, all of which were over-ruled in the county court, and it is our duty to decide whether there be error in the opinions so expressed. We will consider them in the order in which they are stated on the record.

The first is, that the *transcript* of the record filed in the county court, is not a *record* of the proceedings, according to the act of Assembly of 1804, ch. 55.

It has been suggested by the counsel, that a strict regard was had in our acts of Assembly to the distinction between civil and criminal cases in this respect, using the term "transcript" whenever the proceedings in a civil case were directed to be removed, and the term "record" where a criminal case was spoken of. This, however, upon a minute examination, does not appear to be the case. The constitutional right of a party charged to remove his case for trial, was first secured by the act of 1804, ch. 55, confirmed by the act of 1805, ch. 16.

The third section of the act of 1804, contains the particular language relied on. It enacts, that upon suggestion in writing by the party, to the county court in which the prosecution is depending, "it shall and may be lawful for the said court, to order and direct the *record* of their proceedings in the said prosecution to be transmitted to the judges of an adjoining county court for trial," &c.

Now it is to be observed, that the second section of the same act, in reference to civil actions depending in any county court, provides, that upon suggestion made, as therein stated, "the judges thereof shall and may order and direct the *record* of their proceedings in such suit or action, to be transmitted to the judges of any county court within the district for trial, and the judges of such county court to whom such *record* shall be transmitted," &c.

It is thus apparent, that in reference to this question the language is precisely the same in each section, and it is, of course, not possible to infer that the legislature intended to give to the terms used in the second section, a meaning and effect quite contrary to the meaning and effect of the very same terms in the section immediately following, when, as must be conceded, there is no other expression in the whole act to indicate any such intention. Assuming then, as we feel bound to do, that the language in both sections is to be interpreted as of the same import, we have the uniform and unquestioned practical construction of these terms from the confirmation of the act to the present period. In regard to civil causes, it is matter of no unfrequent occurrence in every district of the State, to transmit such a record of their proceedings as we have in this case. It is confidently asserted, that in no one instance have the original papers on file in the court, from which the cause has been removed, been transmitted with the record or as the record; nor has an objection ever been taken by any member of the court or bar to the established practice. Most of the subsequent acts of Assembly adopt the same construction, by using the words "transcript of record," as synonymous with or, at least, equivalent to the word "record," in the sense of the act of 1804.

The usage also and practical interpretation of the third section, has been equally uniform and as equally without objection, as far as we can learn, except only in the case of the *State vs. Dashiell*, 6 *H. & J.*, 268, in which, as would appear by the report, the counsel suggested this question, but the court, in the opinion given, did not allude to it.

Without meaning to intimate that we should have come to a different conclusion, in the absence of such cotemporaneous, consistent, and uniform judicial interpretation, we certainly feel bound not now to disturb 'it.

The second objection is to the insufficiency of the record transmitted from the city court, which, it is said, is "diminished, imperfect and vicious."

The defect chiefly relied on to sustain this objection, consisted in the omission to show that the grand jury was duly impanelled, sworn and charged. The amended record shows, that this defect is not in the record as such from the city court, but an error of the copy, made in the office of the clerk of *Anne Arundel* county court, and now remedied by the accurate copy, sent to us in obedience to the process of this court. One of the counsel also urged as an objection, that the *venire* for the petit jurors should be distinctly stated. How far the peculiar mode prescribed by our acts of Assembly, for the purpose of obtaining a jury, should distinguish the form of entry in this respect from the *formula* proper, in a case where a *venire* issues for the particular cause, it is not necessary here to consider. The *venire* is, in express terms, set out in these words: "wherefore let a jury thereon appear before the court immediately, by whom," &c. And the expressions, "ten of which said jurors being called, come," do not refer to the *venire* as it was urged, but to the impanelling, electing and trying ten individuals from the jury ordered to appear. It is certainly not very fully or very technically expressed, but is incapable, we think, of any construction but that here given. Upon this point, however, we have further to remark, that according to the view we have taken of another part of this case, the irregularity would not be fatal, because it could not produce, by

possibility, the slightest injury to the accused. If the cause was properly removed, the proceeding as to the petit jury, however irregular, produced no influence or effect upon the case, so far as that irregularity was committed in the city court, because the whole proceeding in relation to the petit jury was gone over in the court in *Anne Arundel*, precisely as if nothing had been, in that respect, done in the city court. In a word, the whole proceeding was abandoned, and any mention of it might have been omitted in the record as regards any practical consequences arising from it, except in so far as it goes to ascertain the precise stage of the proceeding in the city court when the removal was ordered, and on which is based the question respecting the right of removal after part of the jury was sworn.

The third objection is, that the prisoner was not "arraigned" in *Anne Arundel* county, which it is urged was necessary by the terms of the third and fourth sections of the act of 1804, ch. 55. The language used in each of these sections is, that the judges of the court to whom the record is transmitted, "shall hear and determine the same, *in the same manner* as if such prosecution had been originally instituted therein."

It cannot escape observation, that these words are, in each section, immediately preceded by words emphatically expressive of the purpose for which this authority is given; for the *trial* of the accused. The privilege secured to the party charged or the State, is to have a fair and impartial *trial*. In such *trial*, the court to which the record is sent is to proceed, in all respects, as the court from which it came would have proceeded in the *trial*, in hearing and determining the trial of the cause. It cannot be said nor has it been contended, that the arraignment is a part of the *trial*, but it has been urged, that the party accused, by "putting himself upon his country for trial," in effect selects the jury then attending, or, at all events, a jury of the county in which he pleads, is equivalent in short to a proposal to try his case before a jury then attending the court, or, at least, a jury of the county.

Now, that such an issue does not contemplate any particular

39     v.8

twelve individuals, is perfectly manifest, from the fact that the arraignment always takes place before the jury are sworn, and often at a previous term, and there is no means of ascertaining which of the attending jurors will constitute the panel, or, indeed, whether it may not be composed of *talesmen*, until the process of challenging, trying and swearing the jury has been gone through.

By the common law, as a general rule, a jury must be returned for the trial of the general issue from the county in which the offence is charged to have been committed. When, therefore, a party pleads not guilty and puts himself upon the country, the authorities tell us a jury is to be returned from the county in which the act was committed. But our local law intercepts this rule in a case of removal, and directs the issue to be tried by a jury from another county.

There are cases under the *English* statutes, *vide 2nd Hawk. Pl. Cr.*, 559, in which, for the trial of offenders, a jury may be taken from a different county, but we have no intimation of a different form of entry in this respect, or of a difference in any respect in the mode of arraignment.

The language of this appeal to the party, "how will you be tried?" and his answer, "by my country," is a form handed down from the period, when a party accused had the privilege of selecting a trial by jury or, by "ordeal," the "corsned," or by "battle." When asked how he would be tried, his reply determined which of these modes he selected, and to put himself upon his country was the formal mode of selecting a trial by jury. If he selected the trial by battle, he pleaded "not guilty, and that he was ready to defend the same by his body;" and, in fact, besides the plea of not guilty, the party was "arraigned" under the old process of trial by "battle," where there is no trial by jury. *Vide* numerous authorities cited in 2 *Hawk. Pl. Cr.*, 231, *sec.* 30, and 587, *sec.* 3. And in reference to removals from the King's Bench, 1 *Chit. Cr. Law*, 201, it is expressly said, "in these cases the *venue* in the indictment remains the same, and the place of trial alone is changed." Again, we have an illustration from the same provision

in regard to civil causes. When an issue is tendered, the party "puts himself upon the country," and the acceptance of the issue is in similar terms; yet, so far is it from being necessary to reframe an issue in the county to which a civil cause is sent for trial, that it is actually provided in the second section, which immediately precedes that directing the removal of a criminal prosecution, that the civil cause shall be removed at or during the term at which the issues are made up. These remarks also fully answer the fourth objection.

The fifth objection, that the court in *Anne Arundel* refused to issue a writ of diminution, was properly abandoned, as well because there is no power in the county court to issue such a writ in a criminal case, as because in fact, though diminution was suggested, there was no application made for such process.

The sixth objection, that a second removal was not ordered by *Anne Arundel* county court, is not tenable. The words of the constitution are, that "a party presented or indicted in any of the county courts, may apply to the court before whom the indictment may be depending," and have his case removed. There is nothing to indicate a purpose to authorise a second removal. The policy of the law is to have the cause tried in an "adjoining county." This object may be defeated to the almost infinite delay of justice, and the great oppression of witnesses by adopting the argument of the counsel. If a second removal may be had, why not a third, a fourth, and as many removals as there are counties in the State, until, ultimately, the cause, if tried at all, is to be tried at some place the most remote and inconvenient to all who are witnesses or otherwise connected with it, and after a period of time in which the material testimony in the cause had been lost? The law seems to contemplate a condition of excitement in the immediate community, which has been the witness of an imputed crime, productive of feeling, either of prejudice or partiality, which might hazard a fair and impartial trial; but it has not assumed that such excitement will exist in all the adjacent counties, and reliance is, of necessity, had in the integrity and discretion of the court to select such an adjacent county, as is least likely

to be influenced by any considerations of an extraneous character. Here, again, we have an analogy from the corresponding provisions of the same instrument in relation to civil cases. All the argument that has been urged in reference to the design to remove the trial to a place not infected with prejudice, and the insufficiency of the remedy, if not allowed to one party after it has been exercised by the other, will apply with equal force to civil causes, and yet the interpretation of the law was settled contrary to the claim now made, and it is confirmed by express legislative provisions, assuming the construction we now give to this enactment to be the proper one. *Vide* act of 1838, ch. 245. That a further provision in regard to removals in criminal cases would be a very proper one, may be conceded, but it must originate with the legislature, and, if adopted, will doubtless be guarded by limitations, which will prevent its abuse. But we consider this question conclusively settled by the express terms of the acts of 1805, ch. 65, sec. 49, and 1809, ch. 138, sec. 20, in both of which it is expressly required, that the suggestion shall state that a fair and impartial trial cannot be had in the *court in which the indictment is found,* and provision thereupon is made for the removal by the *said* court— the court in which the indictment was found—and by none other.

The next objection urged upon us, is, that the city court of *Baltimore* had no power to remove this cause. In the first place, this power is denied under any circumstances, and in the next, because, if it exist at all, it was not exercised in time.

In the consideration of this question, we do not think the argument should be confined, as it seems to have been, by the appellant's counsel, to a discussion of the constitutional provisions on this subject. It is very proper to regard the condition and authority of the courts in this State, in reference to this subject, prior to, and independent of the amendment adopted in 1804, '5.

The present system by which the city court of *Baltimore* exercises its jurisdiction, was brought into being by the act of 1816, ch. 193, which, in the broadest terms, gave to it "all

the powers, jurisdiction and authority" then held and exercised by the court of oyer and terminer for *Baltimore* county.

The court of oyer and terminer, thus superseded, was established by the act of 1793, ch. 57.

By the second section of that act, "all causes and proceedings relative to the trial of felonies and other crimes depending in *Baltimore* county criminal court, shall be tried and determined before the justices" to be appointed pursuant to the first section. Its jurisdiction was almost entirely confined to criminal cases. The subsequent sections create new felonies, alter the mode of punishment previously inflicted for most crimes, and in many respects create a new code of criminal law for the State. A very peculiar feature in that act, and one which evinces the prominent position occupied by the new court, in the view of the legislature, is, that this criminal code is embodied in various clauses which are worded as if designed solely for the cognizance of that particular court, until, in the twenty-eighth section, the same power and authority are given to the general court, and the several county courts, within their respective jurisdictions, with the exception carefully made of *Baltimore* county court, whose criminal jurisdiction was entirely taken away, and vested in the newly erected tribunal. Thus the justices of the court of oyer and terminer were not only vested with full and ample jurisdiction of all crimes committed in the city of *Baltimore*, but their authority was, by this act, made a sort of standard by which to measure the extent of the criminal jurisdiction of the other courts of the State.

There are other acts of Assembly relating to this court, but they produce no change in its character or jurisdiction, so far as the question now before us is concerned. It so continued at the time of the amendment of the constitution reorganising the judicial system, and for some years after, until, in 1816, it was superseded by the present city court.

Thus it will appear, that when, by the confirmatory act of 1805, the provisions of the act of 1804 became part of the constitution, and the present county courts were substituted for

the general court, which was thereby abolished, the criminal jurisdiction of the State was exercised by the judges of the county courts, except, only, within the limits of the city of *Baltimore*, where it was completely abolished, and in regard to all crimes vested in the justices of the court of oyer and terminer. The new organisation effected by the act of 1805, made it necessary to provide, in detail, for the administration of the new system, and at the same session, ch. 65, this duty was performed with precise minuteness, both in respect to criminal and civil cases. The twenty-fifth section of that act recognised the court of oyer and terminer, and disclaimed any purpose to alter or change its powers and jurisdiction, or to give criminal jurisdiction to *Baltimore* county court. The forty-ninth section, which speaks of the removal by an accused party, requires the suggestion to be made "in the *court* where the indictment is found," and "the *said court*" is to direct the removal; and yet, elsewhere, the *county* court is described by its appropriate title in every instance in which the county court alone, was exclusively the object of the provision.

It would thus appear, that at the very session when the present judicial system for the State was adopted, those by whom it was introduced, regarded and treated the court of oyer and terminer as possessed, in respect to criminal jurisdiction within the city of *Baltimore*, of all the general powers and authority which the several county courts possessed within their respective territorial jurisdictions. Such has been the opinion, we believe, uniformly acted upon from the time of its first existence, now more than half a century, and it is not, and cannot be doubted, that the present city court has all the jurisdiction which the court of oyer and terminer previously possessed.

It has been always held, that the county courts in this State, being the only courts of record with original common law jurisdiction, can rightfully exercise all the powers exercised in *England*, by the court of King's bench, so far as these powers are derived from rules and principles of the common law, and so far as the same are suited to the change in our political insti-

tutions, and are not modified by our constitutional or statutory enactments.

That the court of King's bench has rightfully exercised this power of removal as an acknowledged, if not an essential part of its ordinary common law jurisdiction, both in respect to criminal and civil cases, does not seem to have been doubted in any of the cases in which its exercise is reported to us, of which several may be found referred to in 1st *Chitty's Cr. Law*, 201. It is there said, that "at common law, the court has the power of directing the trial to take place in the next adjoining county, when justice requires it." Why not exercise this power as well as *certiorari* or other common law process, which is of daily occurrence? During the existence of the general court, the process of *certiorari* answered every necessary purpose, and was, in consequence, the familiar practice; but when that court was abolished, and it was considered, as doubtless it must have been, that the courts being of co-ordinate grade, and each equally supreme within its territorial limits, some mode was proper to be adopted as a substitute for the *certiorari* or other common law process, to continue the enjoyment of this privilege. That it was not the intention of those who amended the constitution, to destroy this right, is not a debateable question. They not only express a contrary design, but they make the privilege, for the first time, an object of constitutional security, leaving to the legislature no longer the power to deprive a party of its exercise, but only the power of extending it, or prescribing the *mode* of its exercise.

The argument of the appellant's counsel can only be sustained upon the hypothesis that, by this attempt to place this highly prized privilege upon a more sure and certain foundation, the authors of the amended constitution have singled out the citizens of a certain district of the State, to whom they have denied this privilege of a fair and impartial jury, which they have not hesitated to say. should be secured to all others, by an immutable law. The case now before us is, to be sure, the case of the State, but it must be remembered, that the same considerations must govern, and the same result be obtained, in

regard to the State and the party.   There is no canon of interpretation which can be applied to the one, which will not apply with equal force to the other.   The apparent inconsistency of attributing to the amendment of 1805, a purpose directly at variance with its avowed object, has led the courts of the State to adopt what we suppose a just interpretation of the law.   The practice of sending criminal causes from the city court, has never ceased.   The subject has been twice before this court, and on each occasion, the right of removal has been sustained.

The first case, of *State vs. Davis*, 3 *H. & J.*, 154, was during the existence of the court of oyer and terminer.   The grounds of that decision have been powerfully assailed in the argument. How far they are tenable, it is not necessary to express an opinion.   We concur in the conclusion, so far as the present question is affected.

The case of *State vs. Dashiell*, 6 *H. & J.*, 268, was after the establishment of the city court, and the language of the court seems to be only consistent with the views we have expressed.   It is there said: " The constitution directs the removal to another *county*, to avoid the prejudices which may exist in the county where the presentment is found;" and " the act of 1821 declares, the court shall not be bound to remove it to *another* county." Now it is clear, if the constitution had no reference to criminal cases in the city court, the act of 1821 could not be affected by its prohibition.   As before said, the legislature had power to add to, or take from its jurisdiction, in this respect, as much as in any other, and this limitation, if to be found in the amendment, could only be in consequence of its being included within the spirit of the particular clause, relating to removals.

The legislative department of the government have also given this exposition in various enactments.   The act of 1805, ch. 65, passed at the same session, seems to assume it.   The act of 1809, ch. 138, clearly indicates it.   The act of 1821, ch. 161, though declared unconstitutional in another respect, directly asserts it.   And the act of 1823, ch. 67, and other subse-

quent laws, make provision for costs incurred in such removals; to say nothing of the act of 1840, ch. 211, passed solely for the purpose of prescribing the terms on which it is to be exercised. With such a mass of authority so long and so uniformly acquiesced in, for very nearly half a century, we cannot now feel justified in opposing the first instance of resistance.

But it is urged, that the authority to remove, if possessed by the city court, was not executed in proper time. This brings into review the second branch of this objection, to wit: that the application for removal was too late after a part of the petit jury was sworn.

As before remarked, the object of the removal is to secure a fair and impartial " trial." If the cause is to be removed for *trial*, it must be removed before the trial, or any part of the trial is had in the court ordering the removal. The trial, and all the trial, must be had in the court to which the cause is transmitted. It is manifest, therefore, that the solution of the question depends upon what is to be considered the trial—the commencement of the trial. Of course it is not intended to have reference here to the case of a new trial granted after verdict, or the case in which a jury having had the testimony submitted to them, have been discharged by the court, in consequence either of their inability, after a long time, to agree upon a verdict, or of the illness of any member, or of any other cause which will justify the court in discharging the jury. In these cases, as it is necessary to try the case *de novo*, the second trial is as much a trial, then, within the contemplation of law, as the first was, before the party was put to the bar.

The question here is, had this *trial* commenced when the motion to remove was preferred by the attorney general? My brethren all concur in the opinion, that the trial could only be said to commence, within the contemplation of the law regulating removals, when the panel of twelve jurors was completed, by being duly sworn.

In this opinion I cannot unite. According to my view, the trial commenced when the jury was called, and the prisoner put to his challenge. The respect due to my brothers, must

40    v.8

restrain me from offering an argument, or giving authorities to sustain my own view, and delicacy must prevent any attempt to assign the grounds of the opinion which they have authorised me to express for them. This branch of the objection is, therefore, also overruled.

JUDGMENT AFFIRMED.