JOANNE M. FREYERMUTH, administratrix, vs. SAMUEL J.
LUTFY.

Norfolk. September 15, 1978. — November 13, 1978.

Present: HENNESSEY, C.J., QUIRICO, BRAUCHER, KAPLAN, & LIACOS, JJ.

*Way*, Public: stop sign. *Negligence*, Motor vehicle, In use of way. *Law of the Road. Evidence*, Admitted without objection. *Proximate Cause.*

In a negligence action arising from an automobile accident, evidence
that the plaintiff had stopped her automobile at a stop sign before
proceeding into the intersection where she was struck by the de-
fendant's automobile, that the plaintiff was entirely within the
intersection when the collision occurred, and that the defendant
was proceeding at an improper rate of speed, warranted a finding
that the defendant was 60% negligent. [615–618]
In a negligence action arising from an automobile accident, there was
sufficient evidence to warrant findings that the trauma and mental
distress brought on by the accident precipitated a recurrence of the
plaintiff's preexisting mental illness, which had been in remission,
and that the plaintiff's subsequent suicide was an unpremeditated
and spontaneous act which was the result of that illness. [618–620]

TORT. Writ in the Superior Court dated June 26, 1972.
The action was heard by *John P. Sullivan*, J.
After review was sought in the Appeals Court, the Su-
preme Judicial Court, on its own initiative, ordered direct
appellate review.

*John J. Thornton* for the defendant.
*Alton F. Lyon* for the plaintiff.

LIACOS, J. The administratrix of the estate of Norma M.
Kendall seeks recovery in this tort action against Samuel
J. Lutfy for the conscious pain and suffering of the dece-
dent and for wrongful death. The plaintiff alleged in her
amended complaint that the defendant's negligent oper-
ation of a motor vehicle caused Mrs. Kendall severe per-

sonal injuries, resulting in her death by suicide. At a jury waived trial, evidence was presented with respect to the central issues of (1) whether the defendant was negligent and (2) whether the suicidal death of the plaintiff's decedent was causally related to the accident. After the trial, the judge filed findings resolving both issues in favor of the plaintiff and ordered entry of judgment for her. The defendant appealed. We transferred the appeal from the Appeals Court on our own motion. We affirm.

We summarize the pertinent facts, as found by the trial judge.

On the morning of November 30, 1971, the decedent Norma Kendall was involved in an automobile accident at the intersection of Ashland and Washington streets in the town of Abington. She was driving a 1971 International Scout automobile eastbound on Ashland Street. Lutfy, the defendant, was operating a 1971 Ford Econoline automobile southbound on Washington Street. The weather was clear and the roads were dry. A stop sign governed traffic entering Washington Street from Ashland Street. At the time of the accident, telephone trucks were parked near the intersection, obstructing to some degree the view of vehicles either traveling southbound on Washington, or entering Washington from Ashland.

As soon as Lutfy saw the Kendall vehicle, he applied his brakes and traveled about one length of his vehicle before the collision occurred. His van impacted the left front of the Kendall vehicle. The entire front of that car was bent to the right hand side or away from the driver's side. After the collision, the Kendall car spun around in the roadway. The judge found that the decedent had stopped at the stop sign before proceeding into the intersection and was entirely within the intersection at the time of collision, while Lutfy was only partially into the intersection. Further, he found Lutfy to be 60% negligent.

Several years prior to the accident, from June, 1963, to December, 1965, the decedent had been hospitalized on

four occasions for a mental disorder. The diagnostic impressions during those hospitalizations were as follows: Involutional psychotic reaction: paranoid type; Involutional psychotic reaction: most probably of a depressive type. However, from the time of her release from the Foxborough State Hospital in December of 1965 up to the date of the accident, the illness of the decedent was in remission. For several years prior to the accident she was employed as a librarian in Abington, and had kept house for herself and her husband.

Immediately following the accident, the decedent got out of her vehicle and appeared to be in shock. She did not speak or respond to any remarks made to her. She appeared dazed and walked away from the scene. On the same day, she was taken to Goddard Hospital and then transferred to Foxborough State Hospital. She was completely psychotic and required physical restraint.

The medical records indicated she had sustained a contusion on her forehead and also leg injuries. She was belligerent, hostile, and uncooperative during most of her stay at the hospital. She remained there until December 17, 1971, when she was let out on an indefinite visit. On January 20, 1972, Norma Kendall took her life by means of self-inflicted cuts from a sharp razor.

On the issue of proximate causation, the judge found that (1) the decedent had had a preexisting illness diagnosed as paranoia which was in remission and had been for the six years preceding this accident, (2) the trauma and mental distress of the accident precipitated a recurrence of the illness, and (3) the suicide itself was an unpremeditated and spontaneous act resulting from that illness. The judge found for the plaintiff in the amount of $5,000 for conscious pain and suffering and $20,000 for wrongful death.[1]

---

[1] Since the decedent had been found 40% negligent, these judgments were reduced to $3,000 and $12,000, respectively, pursuant to the version of G. L. c. 231, § 85, applicable to this accident. See St. 1969, c. 761.

The defendant contends that the judge's findings with respect to both the issues of negligence and proximate causation are unwarranted by the evidence, and require reversal of the judgment, or, at least, remand for a new trial. As the defendant recognizes, in nonjury cases such as the one before us, the rules provide that "[f]indings of fact shall not be set aside unless clearly erroneous . . . ." Mass. R. Civ. P. 52 (a), 365 Mass. 816 (1974). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Marlow* v. *New Bedford*, 369 Mass. 501, 508 (1976), quoting from *United States* v. *United States Gypsum Co.*, 333 U.S. 364, 395 (1948). We think that no such mistake in fact-finding has been committed. Further, we think that the judge's ultimate findings of liability in the defendant are neither clearly erroneous nor inconsistent with the relevant legal standards. See *Marlow* v. *New Bedford*, *supra* at 508.

1. *Sufficiency of the evidence as to the defendant's negligence.* We cannot agree with the defendant's claim that the judge committed plain error in finding him 60% negligent. Let a few points suffice. The judge found that Mrs. Kendall was entirely within the intersection at the point of collision, while Lutfy was only partially into the intersection. The testimony of one of the telephone repairmen, a disinterested witness, formed part of the basis for this finding. Additionally, Lutfy testified that he had not entered the intersection when he impacted Kendall's vehicle.

The rule of right of way at intersections is set forth in G. L. c. 89, § 8.[2] The clear inference from the testimony

_____

[2] General Laws c. 89, § 8, reads: "Every driver of a motor or other vehicle approaching an intersection of any ways, which for the purposes hereof shall mean the area embraced within the extensions of the lateral curb lines, or, if none, then the lateral boundary lines, of intersecting ways as defined in section one of chapter ninety, shall

is that Mrs. Kendall entered the intersection first. However, her right of way was modified by the presence of a stop sign on Ashland Street at the intersection, with Washington Street. The rule in such situations is that "[o]ne directed to stop by such a sign may not have the benefit of the general rule, if the rule grants him the right of way, until he has complied with the order to stop. After he has stopped, he again becomes subject to the general rule and may proceed and thereafter exercise the right of way in accordance with that rule." *Canane* v. *Dandini,* 355 Mass. 72, 75 (1968).

The judge determined that Mrs. Kendall had stopped at the stop sign.[3] The defendant argues that this finding is clearly erroneous, based as it is on the investigating police officer's uncorroborated hearsay testimony that someone at the scene had so informed him. This testimony was elicited by the plaintiff on redirect examination and clarified by the defendant on recross. The defendant at no time made either an objection to the question or a motion to strike the answer. The consequence of the failure to object is to waive the objection to the testimony. *Douglas* v. *Holyoke Mach. Co.,* 233 Mass. 573 (1919). W. B.

---

grant the right of way to a vehicle which has already entered such intersection, and every driver of a vehicle entering such an intersection shall grant the right of way to a vehicle so entering from his right at approximately the same instant; but the foregoing provisions of this section shall not apply at any intersection of ways when a driver is otherwise directed by a police officer, or by a lawful traffic regulating sign, device or signal maintained by or with the written approval of the department of public works and while said approval is in effect or otherwise lawfully maintained."

[3] We recognize that the duty to exercise due care requires a driver who has halted at a stop sign to behave with reasonable caution before entering an intersection. Even a driver who has stopped at a stop sign and has (§ 8) the right of way may be found negligent if he proceeds into the intersection before he can do so with reasonable prudence and with suitable regard for his own safety and that of others. *Canane* v. *Dandini,* 355 Mass. 72, 76 (1968). That the judge heeded and had occasion to apply this rule of law is demonstrated by his finding that the decedent was herself 40% negligent.

Leach & P. J. Liacos, Massachusetts Evidence 72 (4th ed. 1967). Although the testimony doubtless would have been excluded on objection, in the absence of objection it retains its full probative force. *Regan* v. *John J. Amara & Sons*, 348 Mass. 734 (1965). *O'Kane* v. *Travelers Ins. Co.*, 337 Mass. 182 (1958). Thus, the defendant's claim of clear error as to this finding by the judge is ill-founded.

The judge also determined that (1) the view of the intersection was obstructed, (2) Lutfy applied his brakes when he saw the Kendall vehicle, and then traveled about one length of his vehicle before the collision occurred, and (3) Kendall's car, impacted on the left front and damaged consistently with that impact, spun around in the roadway after the collision. Despite the defendant's protestations to the contrary, we think that these additional findings, supported by ample evidence in the record (including photographic exhibits), further substantiate the judge's determination of 60% negligence in the defendant, for the reasons which follow.

The defendant contends there was no evidence that he was proceeding at an improper speed. We disagree. General Laws c. 90, § 14, as amended through St. 1969, c. 54, § 2, sets forth the appropriate standard. In pertinent part, it states: "The person operating a motor vehicle on any way or a curve or a corner in said way where his view is obstructed shall slow down and keep to the right and upon approaching any junction of said way with an intersecting way shall, before entering the same, slow down and keep to the right of the center line." The record indicates that, despite the presence of the obstructing telephone vehicles at the intersection he was approaching, the defendant did not slow down until he actually saw the Kendall vehicle.[4] In view of the mandate of c. 90,

---

[4] COUNSEL FOR THE PLAINTIFF: "Well, you didn't slow up for the telephone trucks?" THE WITNESS: "I didn't." COUNSEL FOR THE PLAINTIFF: "You never applied your brakes?" THE WITNESS: "No, sir, not until I saw her."

§ 14, and on the basis of both the testimony in the record and photographic evidence of the damage to the Kendall vehicle, the judge could reasonably infer that the defendant was operating his vehicle at an excessive rate of speed. See *Fallovallita* v. *Johnsyn,* 317 Mass. 153 (1944).

Thus, warranted as it is by a reasonable view of the evidence, and in light of the relevant statutory provisions, we find no error in the judge's determination of 60% negligence in the defendant. See *Russell* v. *Central Package Store, Inc.,* 359 Mass. 750 (1971); *Stanchfield* v. *Railway Express Agency, Inc.* 326 Mass. 796 (1950).

2. *Sufficiency of the evidence to substantiate the finding that the accident was the proximate cause of Mrs. Kendall's suicide.* The defendant also challenges as clearly erroneous the judge's findings that (1) the trauma and mental distress of having been involved in the accident precipitated in Mrs. Kendall the recurrence of the preexisting mental illness which had been in remission for the preceding six years, and (2) the suicide itself was an unpremeditated and spontaneous act which was the result of that illness. The record contains ample evidence to substantiate the finding that the accident triggered Mrs. Kendall's relapse.[5] Prior to the mishap in 1971 Mrs. Kendall had last been hospitalized for her psychiatric condition in 1965. Her daughters testified that until the accident, she had been leading a normal, active life. She was a good housewife, took care of her husband, had no difficulty in carrying on a conversation, and enjoyed a part-time job as a librarian. She was on her way to work when the accident occurred. Immediately following the accident, her behavior changed markedly. She was unresponsive to questions and appeared to be in a state of shock.

---

[5] The established rule is that where the result of an accident is to activate a dormant or incipient disease, or one to which the injured person is predisposed, the negligence which caused the accident is the proximate cause of the disability. 57 Am. Jur. 2d Negligence § 160 (1971). See Restatement (Second) of Torts §§ 456, 461 (1965). Neither this principle, nor its application to the instant case, is at issue here.

She became hostile and belligerent, and began to exhibit bizarre behavior. Her daughter testified that on Mrs. Kendall's transfer to Foxborough State Hospital she was "fighting like crazy" and required physical restraint. The hospital records indicate she continued to exhibit irrational behavior at Foxborough State Hospital. On December 17, 1971, she was released on an indefinite visit, and took her life just over a month later.

Dr. Mezer, a psychiatrist and a duly qualified expert, testified that in his opinion the accident precipitated a recurrence of Mrs. Kendall's involutional psychosis. The judge so found. There was no error on this point.

The evidence also warranted the judge's determination that Mrs. Kendall's suicide was an unpremeditated and spontaneous act caused by the recurrence of her illness.[6] Dr. Mezer testified to this effect and described the suicide as being the result of an "irresistible impulse."[7] His opin-

---

[6] Both parties agree that the applicable rule as to liability of the defendant for death by suicide is set forth in *Daniels* v. *New York, N.H. & H.R.R.*, 183 Mass. 393, 399-400 (1903), which states: "[T]he liability of a defendant for a death by suicide exists only when the death is the result of an uncontrollable impulse, or is accomplished in delirium or frenzy caused by the collision, and without conscious volition to produce death, having knowledge of the physical nature and consequences of the act." See Restatement (Second) of Torts § 455 (1965); W. Prosser, Torts § 44, at 280 (4th ed. 1971). The judge in his memorandum of opinion described the decedent's act of suicide as an "unpremeditated and spontaneous act which was the result of" the mental illness. In the context of this case, we view this finding as equivalent to a determination that the suicide was the result of an "uncontrollable impulse" or "irresistible impulse" produced by the decedent's illness.

[7] COUNSEL FOR THE PLAINTIFF: "The precipitation of this suicidal act. It was a premeditated thing?" THE WITNESS: "No, sir, it was not premeditated. It was the result of the illness, paranoidal illness which had been precipitated by the accident, which was in partial remission but not in complete remission at the time of discharge, was still present. And I believe that the suicidal impulse as a result of that illness and that the illness also interfered with her ability to resist that impulse, so that you had both the illness causing the impulse and interfering with the ability to resist it." COUNSEL FOR THE PLAINTIFF:

ion was based on the hospital records he had examined, which described the decedent's condition both before and after the accident. It was also based on an interview with members of Mrs. Kendall's family in which they disclosed that she had been preparing supper, had intended to go out that night, and had laid out on her bed the clothing she was going to wear. Shortly thereafter she was discovered in the bathtub, having cut her throat with a razor blade.[8] On examination of the evidence in the record, we think that the judge was warranted in finding that Mrs. Kendall, on account of mental derangement precipitated by the accident, was incapable of resisting the impulse to destroy herself. As a result, he was justified in finding liability in the defendant. See *Sponatski's Case*, 220 Mass. 526 (1915). Accord, *Fuller* v. *Preis*, 35 N.Y.2d 425 (1974).[9]

*Judgment affirmed.*

---

"So is it fair to say that as a result of the irresistible impulse, the act was committed?" THE WITNESS: "Yes, sir."

[8] The defendant now argues that it was error for the judge to rely on this expert testimony to the extent it was based on extra judicial statements of the family to the expert witness. It should be noted that the defendant failed to object or move to strike the expert testimony to the extent it was based in part on hearsay statements. Even though it might have been excluded, in the absence of an objection it was entitled to be considered and given its appropriate evidentiary value. See *O'Kane* v. *Travelers Ins. Co.*, 337 Mass. 182 (1958); *Mahoney* v. *Harley Private Hosp., Inc.*, 279 Mass. 96 (1932). We note also that the judge makes no specific reference to this testimony as being the basis of his findings.

[9] In *Fuller* v. *Preis*, 35 N.Y.2d 425 (1974), the plaintiff's decedent, who was suffering from traumatic organic brain damage as a result of an accident seven months before, acquired a gun, changed his will two days before his death, wrote two suicide notes, and then committed suicide. The Court of Appeals of New York (Breitel, C.J.) held that the evidence supported a finding that an insane, if not sudden, "irresistible impulse" caused the decedent to take his life, and that recovery by the plaintiff would be warranted under this theory. We think that the record in the instant action presents at least as strong a case for recovery.