Larry A. SCHAFER, Petitioner,

v.

Shirley S. HOFFMAN, Respondent.

No. 91SC225.

Supreme Court of Colorado,
En Banc.

June 22, 1992.

Strate and Tondre, P.C., George J. Strate, David L. Fry, Wheat Ridge, for petitioner.

Bragg, Baker & Cederberg, P.C., Douglas E. Bragg, John T. Baker, Patrick J. Burke, Denver, for respondent.

Justice VOLLACK delivered the Opinion of the Court.

Petitioner, Larry Schafer (Schafer), petitions from a court of appeals decision in *Hoffman v. Schafer*, 815 P.2d 971 (Colo. App.1991). The court of appeals affirmed the judgment entered on a jury verdict in favor of Shirley Hoffman (Hoffman) in the amount of $715,000. We affirm.

## I.

On January 15, 1988, Schafer struck Hoffman, a pedestrian, with his vehicle. Schafer was under the influence of alcohol and drugs at the time of the collision. As a result of the collision, Hoffman sustained numerous injuries, including a compression fracture in a spinal vertebra, a concussion with intracranial bleeding, a fractured femur in her left leg, and torn cartilage in her left knee. Hoffman also sustained oth-er injuries to her left leg, left hand, and right elbow.

Hoffman filed an action against Schafer which proceeded to trial on January 3, 1989. Schafer admitted negligence in the operation of his vehicle but denied that his conduct was willful and wanton, and disputed the nature and extent of Hoffman's injuries. Schafer contended that Hoffman had pre-existing injuries for which he was not liable because they were not caused by his conduct.

Hoffman produced numerous witnesses at trial, including Dr. Rupp, her orthopedic surgeon. Dr. Rupp testified that he treated Hoffman shortly after the January 15, 1988, accident. Dr. Rupp was aware that Hoffman had developed thrombophlebitis (blood clots) in her left leg, around her knee, as a result of the accident.[1] Hoffman took anticoagulant drugs in order to reduce clotting. As a result, Dr. Rupp could not perform surgery on Hoffman's knee until the clotting had sufficiently dissipated. Dr. Rupp referred Hoffman to a physical therapist, but determined early in the fall of 1988 that surgery was necessary based on the lack of improvement in her condition through the course of her therapy.

Dr. Rupp testified that he eventually performed arthroscopic surgery on Hoffman's left knee in December 1988, almost one year after the accident. The surgery revealed that Hoffman had severely torn and displaced cartilage, such that she could not move her left knee joint without severe pain. The surgery also revealed that she had minor softening of the underside of her left knee cap.

Dr. Rupp also testified that he confirmed that Hoffman suffered from causalgia (sensation of extreme pain) which generally occurs after injuries to extremities.[2] Dr. Rupp testified that people can be predis-

---

1. It appears from the record that the admitting orthopedic doctor diagnosed Hoffman as having deep venous thrombosis. Thrombosis is defined as "clotting with a blood vessel which may cause infarction of tissues supplied by the vessel." *Stedman's Medical Dictionary* 1597 (William Hensyl ed., 25th ed. 1990).

2. Causalgia is defined as "[p]ersistent severe burning sensation of the skin, usually following direct or indirect (vascular) partial injury of a sensory nerve." *Stedman's Medical Dictionary* at 261.

posed to causalgia after previously contracting it.

On cross-examination, Schafer elicited testimony that Dr. Rupp had treated Hoffman two months prior to the accident, in November 1987, for pain in her right knee. She could not fully extend her knee at that time and was taking Motrin (a drug designed to decrease swelling of arthritic joints) on an as-needed basis. Dr. Rupp prescribed Darvocet, a mild pain killer, and Chlorinol, an anti-inflammatory drug, during November 1987.

During Dr. Rupp's cross-examination, Schafer also introduced medical records from 1978 indicating that Hoffman previously complained of intermittent low back pain and discomfort with forced flexion.[3] The records included a consultation report stating that Hoffman had problems with her knee for as long as four years (prior to the date of the report).[4] Dr. Rupp testified, however, that the 1978 medical records did not affect his opinion.

Hoffman also produced a second orthopedic surgeon, Dr. Phillip Ceriani, who testified that Hoffman was referred to him after the accident for an evaluation of whether Hoffman needed knee surgery.[5] On cross-examination, Schafer confronted Dr. Ceriani with a report indicating that Hoffman's vertebra fracture might be old. Dr. Ceriani testified, however, that the vertebra fracture was caused by the trauma of the accident.

Hoffman produced her physical therapist and a rehabilitation counselor. Jim Richardson, her physical therapist, testified on cross-examination that Hoffman's arthroscopic surgery revealed that she had degeneration in her knee caused by the normal aging process. Helen Woodward, a rehabilitation counselor, testified that she performed a vocational assessment at Hoffman's request and concluded that Hoffman was unemployable.

In summary, the jury heard evidence introduced by Schafer that Hoffman had complained of knee pain and lower back problems prior to the accident, and that the vertebra fracture might have occurred prior to the January 15, 1988, accident. The jury also was aware that Hoffman's knee had some degeneration as a result of the normal aging process, that Hoffman might be predisposed to causalgia, and that Hoffman's knee surgery was delayed longer than the average person's because of her blood clotting condition.

At the close of trial, Hoffman submitted a "thin skull" instruction which read as follows:

> In determining the amount(s) of plaintiff's actual damages in each of the various categories set forth in Instruction No. 16, you may not refuse to award nor reduce the amount of any such damages because of any physical frailties of the plaintiff that may have made her more susceptible to injury, disability or impairment.[6]

Schafer objected to the giving of this instruction on the grounds that the instruction told the jury that they may not refuse or reduce the amount of damages because of Hoffman's pre-existing physical ailments. Schafer contended that there was no evidence of aggravation of Hoffman's condition and thus Schafer could not be held liable for her pre-existing conditions. The district court, however, gave the challenged instruction to the jury.

The jury found for Hoffman, and Schafer appealed. The court of appeals concluded

---

3. The records related to a hospitalization in 1978 which was primarily for the purpose of intermittent low back pain.

4. The report did not specify which knee was the subject of Hoffman's complaints.

5. Dr. Ceriani testified that Hoffman had a significant amount of chondromalacia which can be mentally or developmentally developed. Dr. Ceriani also testified that Hoffman suffered from causalgia. He testified that most people suffering from knee injuries experience causalgia for a period of two or three months after an accident. Hoffman, however, continued to experience it when Dr. Ceriani first examined her ten months after the accident. Dr. Ceriani's testimony also tended to indicate that Hoffman previously had problems with thrombophlebitis.

6. This instruction does not appear in Colorado Jury Instructions—Civil, which does not contain a pattern thin skull instruction.

that the instruction was a proper statement of the law and that it was supported by the evidence in this case. Schafer petitions this court for a determination that the thin skull instruction is not a correct statement of law and that the court of appeals erred in holding that Hoffman was entitled to the instruction as her theory of the case. We disagree.

## II.

The term "thin skull," or "eggshell skull," is derived from illustrations appearing in English cases wherein a plaintiff with an "eggshell skull" suffers death as a result of a defendant's negligence where a normal person would only suffer a bump on the head. *Dulieu v. White & Sons*, 2 K.B. 669, 679 (1901); W. Page Keeton et al., *Prosser and Keaton on the Law of Torts* § 43, at 292 (5th ed. 1984) [hereinafter *"Prosser"*] (citing Glanville Williams, *The Risk Principle*, 77 L.Q.Rev. 179, 193–97 (1961)). The negligent defendant is liable for the resulting harm even though the harm is increased by the particular plaintiff's condition at the time of the negligent conduct. *Prosser* § 43, at 291; *see also Restatement (Second) of Torts* § 461 cmt. a (1965) ("A negligent actor must bear the risk that his liability will be increased by reason of the actual physical condition of the other toward whom his act is negligent.").

As Prosser notes, there is almost universal agreement on this rule. *Prosser* § 43, at 291 ("There is almost universal agreement upon liability beyond the risk, for quite unforeseeable consequences, when they follow an impact upon the person of the plaintiff."). Liability "beyond the risk," however, is not solely premised on the existence of ascertainable pre-existing physical conditions:

The defendant is held liable when the defendant's negligence operates upon a concealed physical condition, such as pregnancy, or latent disease, or *susceptibility* to disease, to produce consequences which the defendant' could not

reasonably anticipate. The defendant is held liable for unusual results of personal injuries which are regarded as unforeseeable, such as tuberculosis, paralysis, pneumonia, heart or kidney disease, blood poisoning, cancer, or the loss of hair from fright.

*Prosser* § 43, at 291–92 (emphasis added). Some scholars have interpreted the thin skull doctrine to encompass the plaintiff's physical, mental, or financial condition. 4 Fowler Harper et al., *The Law of Torts* § 20.3 (2d ed. 1986). "And these preexisting conditions may have the greatest bearing on the extent of the injury actually suffered by any particular plaintiff in a given case. Thus the same slight blow in the abdomen might cause only fleeting discomfort to a man but a miscarriage to a pregnant woman." *Id.*

Under Colorado law, it is fundamental that a tortfeasor must accept his or her victim as the victim is found. *Stephens and Kraftco Corp. v. Koch*, 192 Colo. 531, 533, 561 P.2d 333, 334 (1977) ("As this court has made clear, a defendant must take his 'victim' as he finds him."); *Fischer v. Moore*, 183 Colo. 392, 394, 517 P.2d 458, 459 (1973) ("Under the common-law principles of tort law, it is axiomatic that the tort-feasor must accept the plaintiff as he finds him . . . .").

Accordingly, under the thin skull doctrine, a tortfeasor "may not seek to reduce the amount of damages [owed to the victim] by spotlighting the physical frailties of the injured party at the time the tortious force was applied to him." *Id.* A thin skull instruction is appropriately given when the defendant seeks to avoid liability by asserting that the victim's injuries would have been less severe had the victim been an average person. *See Priel v. R.E.D., Inc.*, 392 N.W.2d 65, 69 (N.D.1986) (citing *Dulieu*, 2 K.B. at 679) (holding that the defendant could not escape liability where plaintiff had a prior fragile condition making her more susceptible to certain injuries than the average person).[7]

7. In *Dulieu v. White & Sons*, 2 K.B. 669, 679 (1901), the court stated:

If a man is negligently run over or otherwise negligently injured in his body, it is no an-

## III.

■ Schafer contends that the foundation required for a thin skull instruction is not established. Relying on an opinion not selected for official publication, *Herrera v. Nakata*, 478 P.2d 706 (Colo.App.1970), Schafer contends that a plaintiff must prove the existence of a pre-existing bodily condition before the instruction can be given.[8] We decline to adopt such a narrow interpretation.

■ The thin skull doctrine has not been limited to pre-existing bodily conditions. *See Prosser* § 43, at 291–92 and discussion *supra* part II. The doctrine appropriately applies where a plaintiff may be predisposed or more susceptible to ill effects than a normal person. *See City of Scottsdale v. Kokaska*, 17 Ariz.App. 120, 495 P.2d 1327, 1335 (1972) (plaintiff had no pre-existing injury but rather an anatomically different spine); *Walton v. William Wolf Baking Co.*, 406 So.2d 168, 175 (La.1981) (holding that tortfeasor was required to take plaintiff as found, with predisposition to neurosis); *Reck v. Stevens*, 373 So.2d 498, 502 (La.1979) (plaintiff had an underlying emotional instability); *Freyermuth v. Lutfy*, 376 Mass. 612, 382 N.E.2d 1059, 1064 n. 5 (1978) ("The established rule is that where the result of an accident is to activate a dormant or incipient disease, or one to which the person is predisposed, the negligence which caused the accident is the proximate cause of the disability."); *Priel*, 392 N.W.2d at 69 (holding that it was error not to instruct jury that the defendant could not escape liability based on plaintiff's prior fragile condition); *Bigley v. Craven*, 769 P.2d 892, 894–95 (Wyo.1989).

■ The challenged instruction encapsulates the fundamental thin skull doctrine. *Stephens*, 192 Colo. at 533, 561 P.2d at 334;

*Fischer*, 183 Colo. at 394, 517 P.2d at 459. A party "is entitled to an instruction embodying his theory of the case, if there is evidence in the record to support it." *Newbury v. Vogel*, 151 Colo. 520, 524, 379 P.2d 811, 813 (1963).

During trial, Schafer established that Dr. Rupp had prescribed Chlorinol (an anti-inflammatory) to Hoffman for knee discomfort prior to the accident. Schafer attempted to establish that Hoffman had long-standing complaints with regard to her knees. Schafer sought to prove that Hoffman's recovery process was longer than the average person's because arthroscopic surgery expedites recovery but was delayed in Hoffman's case as a result of her blood clotting condition.

Schafer also attempted to establish during cross-examination of Dr. Ceriani that chondromalacia can develop over the course of the normal aging process. Schafer elicited, through cross-examination of Hoffman's physical therapist, that Hoffman had some degeneration in her knee as a result of her age.

The testimony elicited by Schafer in this case could lead the jury to believe that Hoffman suffered frailties or was more susceptible to certain medical infirmities than the average person. The challenged instruction merely informed the jury that Schafer could not escape liability because of Hoffman's condition at the time of the accident. The trial court did not err by giving the thin skull instruction in this case.

## IV.

■ Schafer contends that the court of appeals erred in holding that Hoffman was entitled to a thin skull instruction as her

---

swer to the sufferer's claim for damages that he would have suffered less injury, or no injury at all, if he had not had an unusually thin skull or an unusually weak heart.

8. *Herrera v. Nakata*, 478 P.2d 706 (Colo.App. 1970), not selected for official publication, has no precedential value. *See* C.A.R. 35(f) ("Those opinions selected for official publication shall be followed as precedent by the trial judges of the state of Colorado."); *Goldstein v. Denver*

*Urban Renewal Auth.*, 192 Colo. 422, 425 n. 3, 560 P.2d 80, 83 n. 3 (1977) ("Both parties rely upon a court of appeals' opinion which was not selected for official publication. C.A.R. 35(f) provides that '[o]nly the opinions officially selected for publication shall be binding upon the trial judges of the state of Colorado and shall be considered as stare decisis for the point of law settled therein....' ").

theory of the case. Schafer specifically argues that the court of appeals determination was based on Ms. Woodward's testimony, and that her testimony supported analysis of "true value" issues and not the thin skull instruction. We disagree.

■ The true value or "shabby millionaire" rule complements the thin skull doctrine. Gary Bahr & Bruce Graham, *The Thin Skull Plaintiff Concept: Evasive or Persuasive?*, 15 Loy.L.A.L.Rev. 409, 410 (1982). The thin skull doctrine declares that foreseeability of plaintiff's injuries is not an issue in determining *the extent of injury* suffered, while the true value or shabby millionaire rule declares that foreseeability is not an issue in determining *the extent of damages* that the injuries cause.[9] *Id.* (citing Rowe, *The Demise of the Thin Skull Rule*, 40 Mod.L.Rev. 377 (1977)).

■ The court of appeals discussed the testimony of the orthopedic surgeons regarding Hoffman's particular condition at the time of the accident. In the context of this discussion, the court of appeals noted that Ms. Woodward, a vocational rehabilitation counselor, testified that Hoffman would be disadvantaged in the job market.[10] The record amply supports the court of appeals determination that the thin skull instruction was proper in this case. *See Newbury*, 151 Colo. at 524, 379 P.2d at 813. We thus find Schafer's contention to be without merit, and affirm the judgment of the court of appeals.

**9.** The shabby millionaire rule is illustrated as follows:

> If a person fires across a road when it is dangerous to do so and kills a man who is in receipt of a large income, he will be liable for the whole damage, however great, that may have resulted to his family, and cannot set up that he could not have reasonably expected to have injured any one but a labourer.

Gary Bahr & William Graham, *The Thin Skull Plaintiff Concept: Evasive or Persuasive?*, 15 Loy.L.A.L.Rev. 409, 410–11 (1982) (citing *Smith v. London & S.W. Ry.*, L.R. 6 C.P. 14, 22–23 (1870)); Glanville Williams, *The Risk Principle*, 77 L.Q.Rev. 179 (1961).

**10.** We note generally that testimony regarding *future* employability will not always relate to a victim's condition *at the time* of an accident and may thus not be considered in support of giving a thin skull instruction.