Tucker, Richard T., J.
This case was originally brought on a complaint alleging damages for breach of contract, negligence and violations of G.L.c. 93A. After some delays in the start of trial, the plaintiffs waived the negligence and breach of contract counts of their complaint and elected to go forward with a juiy-waived trial on the G.L.c. 93A claims only. The plaintiffs claim the defendants’ use of certain chemicals to treat a sewer backup in their home caused them damages. They allege multiple breaches of the warranty of merchantability, as well as the warranty of fitness for a particular purpose. After a juiy-waived trial covering nine days from September 28, 2009 to October 22, 2009, and closing arguments on November 17, 2009, the court makes the following findings of fact, rulings of law and order.
I. Findings of Fact
I make the following finding of facts generally, reserving additional specific findings for the Discussion of issues herein.
A. Sewage Spill and Cleanup
On or about June 29, 1999, the Plaintiffs, Douglas and Phyllis Maston (“Mastons”), engaged Paul Poirier d/b/a ServPro of Fitchburg-Leominster (“ServPro”) to clean a city sewer backup in their basement. Raw sewage covered most of their furnished basement to a depth of at least one inch, soaking carpeting which had to be scraped up and removed. The family room, bathroom, sauna and work room were affected, but the laundiy room, which had the only functional but customarily closed window, was not affected. ServPro sent out its Production Manager, Ralph Bustin (Bustin), to estimate the Maston job. Bustin negotiated the price of the job with Mrs. Maston and they agreed the total price for clean-up would be $400.00. Bustin then left the residence and ServPro sent a crew chief, Jason Camerano (Camerano), and a helper to the Maston home to perform the cleaning services Mrs. Maston and Bustin discussed. The ServPro employees arrived, introduced themselves to Mrs. Maston, surveyed the situation, told her to keep out of the basement while they worked, and began working. During the clean-up process Mrs. Maston checked on the progress of the work by conversing with Camerano on more than one occasion.
Either Camerano or his helper mixed a disinfectant solution of SaniPro II, also known as ServPro number 358, or Dodecyl Dimethyl Ammonium Chloride, nAlkyl Dimethyl Benzyl Ammonium Chloride, Sodium Hydroxide. This chemical is a member of a family of so-called quaternary ammonium compounds (“QUATS”). The ServPro employees sprayed the SaniPro II mixture on the contaminated areas before extracting as much of the sewage as possible. The employees then removed any solid sewage and scraped up and disposed of the family room carpet. The basement was pressure-washed with fresh water from the ServPro truck, vacuumed, and then retreated with SaniPro II. Before leaving the Maston home, Mr. Camerano offered fans to Mrs. Maston for the purpose of diying her basement, which was left damp. Not wanting to pay the extra costs required for the fans, Mrs. Maston declined. Within four hours, the ServPro job was completed and Camerano and his helper left the premises. They did not warn Mrs. Maston about any potential dangers associated with re-entering the basement. The ServPro employees believed, as Mr. Poirier believes, that SaniPro II is a safe product and that fans are only necessaiy to expedite diying, not for ventilation. Due to this belief, and because the basement’s only two windows were either non-functioning or difficult to access, the ServPro employees did not ventilate the basement. Although Mrs. Maston was told to stay out of the basement during the product application, no warnings were given for her to remain out of the basement after the workers left. This contrasts sharply with Mrs. Maston’s neighbor’s experience.
Mr. Brian Morand was the Mastons’ neighbor in June 1999. He also suffered a similar sewer backup at that time and contacted ServPro to remove the *366 sewage and clean his basement. ServPro cleaned Mr. Morand’s basement in much the same manner as they cleaned the Mastons’ basement, with SaniPro II. Mr. Morand, however, was warned to stay out of his basement until it was diy. To that end, ServPro provided four air movers (fans) and a dehumidifier for four days. Mr. Morand testified that he was very satisfied with ServPro’s work and noted that it was a very thorough and professional job in a work completion form.
Once the ServPro workers left the Maston home, Mrs. Maston entered the basement and continued cleaning. This cleaning process continued for a number of hours and spanned several days. Mr. and Mrs. Maston both testified to smelling a pronounced cherry odor within their basement for days following the ServPro workers’ departure.[3] Eventually, the Mastons had their basement refinished and subsequently endured two additional sewer backups which were not as severe as the June 1999 incident. The subsequent sewer backups were serviced by a local company using steam clean methods only, not QUATS.
B. Plaintiffs Health
Soon after the 1999 sewer backup, Mrs. Maston developed pain in her nose and throat. She did not seek treatment for this ailment until August, when she visited her primary care physician, Dr. Schneeweis. On August 16, 1999, Mrs. Maston was diagnosed with a nasal infection and was prescribed an ointment for treatment. Her nasal and respiratory problems, however, persisted for years and continue to this day. She consulted Dr. Schneeweis who referred her to numerous other doctors, including ear, nose and throat specialists who confirmed Mrs. Maston’s chronic upper airway inflammation. Mrs. Maston has historically experienced a litany of health problems for which she sought extensive treatment with a multitude of doctors. Notably included in her medical history is a diagnosis by Dr. Schneeweis of asthmatic bronchitis in October 1998. The defendants’ expert, Dr. John Saryan, opined that Mrs. Maston had asthma prior to June 1999 and that the QUATS sprayed by ServPro did not cause her asthma. Dr. Saryan did admit however, that although rare, QUATS can cause the onset of asthma.
In May 2008, the plaintiffs’ expert, Dr. Robert J. McCunney, saw and evaluated Mrs. Maston at the Massachusetts General Hospital Pulmonary Unit. He reviewed her medical records and had telephone discussions with Dr. Schneeweis, Mrs. Maston’s primary care physician. Of particular importance in Dr. McCunney’s diagnosis, were the results of Mrs. Maston’s methacholine challenge test, which revealed hyperreactive airways. Ultimately, Dr. McCunney concluded that Mrs. Maston’s health problems including shortness of breath, burning sensations and fatigue, were the result of exposure to QUATS. Dr. McCunney then referred Mrs. Maston to Dr. Plutarco Castellanos, an asthma specialist, under whose care Mrs. Maston remains today. Dr. Castellanos diagnosed Mrs. Maston with reactive airways disease (a subset of asthma), upper airway inflammation, and chronic rhinitis secondaiy to exposure to ammonium chloride.[4]
C. Plaintiffs Employment
Mrs. Maston worked for many years as a hairdresser and it was her only marketable skill and lifelong vocation. Rather than work as an employee in a salon, Mrs. Maston chose to work as an independent contractor. Her main source of income came from nursing homes or assisted-living facilities. Prior to and during 1999, she mainly worked in two facilities — the Cedar Street Home and Manor on the Hill. Following the 1999 sewer backup, Mrs. Maston felt compelled to stop working due to her ongoing health problems. She testified to an inability to tolerate the odor of products associated with hairdressing, as well as sensitivity to smoke, incense and other odors post SaniPro II exposure in June 1999 and continuing to the present. By 2000, Mrs. Maston was no longer working as a hairdresser at either the Cedar Street Home or Manor on the Hill.
Her earnings in the years leading up to her retirement were as follows: 1994, $12,905; 1995, $10,908; 1996, $11,743; 1997, $6,129; 1998, $9,653; 1999, $9,224. This calculates out to an average of $10,093.67 per year. There is no evidence that Mrs. Maston would have made significantly more than $10,093.67 in the years following 1999. Although, the resident population at Manor on the Hill has risen considerably from 1999 to 2009, there is no convincing evidence that the rise in resident population would probably have translated into an increase in Mrs. Maston’s income.
DISCUSSION AND RULINGS OF LAW
Plaintiffs claim damages resulting from injuries to plaintiff Phyllis Maston causally related to the breaches of the warranties of merchantability and fitness for a particular purpose of the ServPro product SaniPro II. Specifically plaintiffs claim that Phyllis Maston was injured and caused to develop asthma as a result of the defendants’ failure to warn her against or otherwise prevent her from ingesting fumes of the ServPro product, SaniPro II containing QUATS. Plaintiffs state that QUATS are known to cause asthma in certain people and that ServPro and the defendants should have been aware of the same.
At trial Dr. Robert J. McCunney testified as to his May 2008 examination and treatment of Phyllis Maston as well as the testing of her condition and his conclusion that she suffered from hyperreactive airway disease, also known as asthma, caused by her exposure to QUATS in June of 1999. I find Dr. McCunney’s testimony in this regard to be credible and backed by the medical findings of “crusty” nose, burning and pain of the nose and face experienced by Mrs. Maston shortly after her exposure to the QUATS, and the methacholine challenge testing of Mrs. Maston *367 from which the diagnosis of asthma was made. Dr. McCunney testified to the medical literature which evidences the link between exposure to QUATS and asthma in some individuals. Although many individuals exposed to QUATS do not develop hyperreactive airways, individuals with greater sensitivities may. In this regard, the defendants have no defense from the fact that Mrs. Maston may have had greater susceptibilities or predispositions to asthma or hyperreactive airways. It has long been the law that a defendant “takes his victim as he finds him,” M.P.S. Vol. 37, J.R. Nolan & L.J. Sortario, Tort Law, §12.4 (3d ed. 2005), and a defendant may be subject to liability for harm to another although unaware at the time of defendant’s act that a physical condition of the plaintiff might increase the risk of liability and the damages resulting therefrom. Restatement of Law (Second) of Torts §461; Freyermuth v. Lutfy, 376 Mass. 612, 618-20 (1978) (defendant who caused motor vehicle accident involving defendant who suffered from mental disease was responsible for defendant’s suicide and wrongful death). Additionally, one who causes solely an aggravation of a preexisting disease or injury may be liable for this additional harm. Wallace v. Ludwig, 292 Mass. 251, 256 (1935) (“where an injury arising from a cause which entails liability on the defendant combines with a preexisting or a subsequently acquired disease to bring about greater harm to the plaintiff than would have resulted from the injury alone, the defendant may be liable for all the consequences”); Pierce v. Nawn, 5 Mass.App.Ct. 224, 225-26 (1977) (judgment for defendant reversed where judge failed to instruct jury that defendant could be found liable if his actions aggravated plaintiffs condition). Mrs. Maston may have been predisposed to developing asthma; however, I find the proximate cause of the onset of this disease was her exposure in June 1999 to the QUATS found in SaniPro II. It is noted by the court that defendants’ expert, Dr. John Saryan, agreed that QUATS have been shown to cause asthma in some people.
Plaintiffs also point to certain sections of the Material Safety Data Sheets for SaniPro II, as well as the safety policies and procedures established by ServPro. Exposing Mrs. Maston to the vapors of SaniPro II was in violation of ServPro’s own policies and standards. Specifically, the Water Damage Restoration Manual (hereinafter “Manual”) provides that, for customer safely, it is required to
remove occupants from the area to prevent exposure to bioaerosols and other hazardous vapors. Determine if any potentially at-risk people are in building and advise . . . that at-risk people may need to be evacuated. At-risk people may include (but are not limited to) the very young, the old, people with respiratory problems such as asthma or emphysema, people with immunity deficiency, and people sensitive to chemicals such as disinfectants.
Manual, page 2-5. Additionally ServPro knew, in regard to the chemicals it customarily used, that
disinfectants and deodorizers, common chemical agents used in water damage restoration, require safety precautions for workers and occupants. When using any cleaning, disinfectant or deodorizing agent, follow the guidelines in ServPro_ (35026) Chemical Reference Manual for the product being used... some people are ultra sensitive to chemical residues, especially disinfectants and deodorizers. Before using any product, listen for customer comments indicating concerns for odors or chemical usage. Inform customers about the products you will be using and ask if they are sensitive to the product. . .
Customers and occupants should not be present in the area where disinfectants and deodorizers are being applied. Before allowing occupants back in the area ensure the area is properly ventilated and the product has had time to dry, according to the Material Safety Data Sheet and product labeling.
Manual at 2-7.[5]
Defendants argue, however, that the Material Safety Data Sheet (MSDS) for SaniPro II states that inhalation did not present a health hazard, although contact with the skin and ingestion was reported as being hazardous. Surprisingly, the MSDS required the use of a NIOSH Approved Respirator if SaniPro II was being sprayed.
ServPro employees never inquired of Mrs. Maston as to her known sensitivities, nor did they advise her to ventilate the basement and remain out of the basement until the wet surfaces were completely diy. Mrs. Maston was offered fans, at additional cost, to quicken the drying process. In this regard, although the ServPro crew offered the use of fans in the poorly ventilated basement, they never explained to Mrs. Maston any health concerns requiring adequate ventilation.
In direct contrast to the manner in which ServPro dealt with Mrs. Maston was the clean-up project of the Mastons’ neighbor. Mr. Brian Morand, who suffered from the same sewage back-up and lived across the street from the Mastons, was advised to stay out of the basement following ServPro’s cleanup and was advised to have continuously running fans ventilating and drying his basement for four consecutive days. I find that as a result of ServPro’s failure to properly warn or instruct Mrs. Maston as to the potential risks and hazards involved with the SaniPro II product for some people, Mrs. Maston went to her basement immediately following the departure of the ServPro crew and cleaned and rearranged the basement for 2-3 hours on each of the successive 2-3 days. By scraping rubber adhesive from the floor and removing wet boxes *368 and furniture, she was thus exposed to the vapors of SaniPro II for extended periods prior to final drying.
I find that the defendants breached the warranty of merchantability implied by law in that ServPro failed to warn Mrs. Maston of dangerous conditions resulting from the use of the ServPro products. See Maillet v. ATF-Davidson Co., Inc., 407 Mass. 185, 189 (1990). I find that she was caused to develop asthma as a result of her exposure to SaniPro II.
Mrs. Maston claims that as a result of her inhalation of QUATS she has developed chronic asthma, was required to cease her employment (which she testified she would have pursued for another ten years), has incurred medical bills and charges, and has experienced pain and suffering with limitations on her activity level since June 1999.
Mrs. Maston’s testimony as to her reaction to the chemicals and sprays used in hairdressing after June 1999 was credible and compelling. I find that she did cease her employment as a result of her asthmatic condition. Her statement that she would have continued to work for another ten years, in light of her prior medical history, however, is speculative. I find that it is reasonable to expect that she would have worked another five years had she not been limited by the onset of asthma. Thus the diminution of earning capacity suffered by Mrs. Maston totals $50,468.35 ($10,093.67x5).
Medical bills and charges sustained as a result of plaintiffs injuries were not established with any great specificity at trial. Evidence of prescription bills totaling $5,548.88 were offered into evidence. I find that a causal relationship with any depression suffered by Phyllis Maston was not proven by a preponderance of the evidence, and thus I have deducted $1,216.06 for depression and anxiety medication (Cymbalta, Diazepam, Desipramine). I have also deducted $38.48 for the cost of the topical skin cream Fluounomede. I find a total of $4,294.34 of related prescription costs incurred by plaintiff. Additionally, I find a total of related medical treatment charges in the amount of $12,485.98.
Certainly the major component of Phyllis Maston’s damages is her asthmatic condition, expected to be lifelong, and the pain, suffering and limitation of her enjoyment resulting therefrom. I find that she has sustained a permanent injury and interference with her lifestyle to which she was entitled. No mathematical formula exists to value such a loss and reasonable parties might justifiably disagree as to its calculation. I find that Phyllis Maston sustained general damages past, present and future, in the amount of $200,000.00.
The actual damages suffered by Phyllis Maston thus total $267,248.67.
As a spouse of the injured Phyllis Maston, Douglas Maston is entitled to recover damages for his provable loss or interference with his wife’s services, affection, society, companionship, love, and sexual relations caused by defendants’ wrongful actions. Diaz v. Eli Lilly & Co., 364 Mass. 153, 160 (1973). Evidence at trial of such loss of consortium was scant, with only some interference with Phyllis Maston’s ability to travel on vacations and interference with future plans with her husband being presented. I award Douglas Maston $5,000.00 for his loss of his wife’s consortium.
A substantial breach of warranty generally constitutes a violation of G.L.c. 93A, §2. A breach of the implied warranty of merchantability, as I find in this matter, is such a breach. Maillet v. ATF-Davidson Co., 407 Mass. 185, 193 (1990); Calimlin v. Foreign Car Center, Inc., 392 Mass. 228, 235 (1984); Burnham v. Mark IV Homes, Inc., 387 Mass. 575, 577 (1982); 940 Code Mass. Regs. §3.08(2) (1996) (“It shall be an unfair and deceptive act or practice to fail to perform or fulfill any promises or obligations arising under a warranty”). An intent by the defendants to breach the implied warranty and thus violate c. 93A is not required in order to establish liability. Linthicum v. Archambault, 379 Mass. 381, 388 (1979). The defendants’ failure to warn Phyllis Maston of hazards presented by the use of SaniPro II is a breach of warranty and an unfair or deceptive act or practice in violation of G.L.c. 93A, §§2, 9.
Having found a violation of c. 93A, the issue is presented whether that violation was willful or knowing. G.L.c. 93A, §9(3) provides in part;
In all other cases, if the court finds for the petitioner, recovery shall be in the amount of actual damages or twenty-five dollars, whichever is greater; or up to three but not less than two times such amount if the court finds that the use or employment of the act or practice was a willful or knowing violation of said section two or that the refusal to grant relief upon demand was made in bad faith with knowledge or reason to know that the act or practice complained of violated said section two.
The provisions of the statute awarding multiple damages for knowing or willful actions are punitive in nature and serve to deter intentional or knowledgeable acts. Haddad v. Gonzalez, 410 Mass. 855, 869 (1991); Drywall Systems, Inc. v. FYI Constr. Co., 435 Mass. 664 n.4 (2002).
“Knowing” and “willful” for the purposes of c. 93A, are not defined in the statute. Case law has held that a party’s actions are knowing or willful if the defendant acts with the intention or with the conscious objective of committing unfair or deceptive practices. Datacomm Interface, Inc. v. Computerworld, Inc. et al., 396 Mass. 760, 780 (1986) (fraudulent representations in knowing disregard of the truth); Heller v. Silverbranch Constr. Corp., 376 Mass. 621, 624 (1978) (callous and intentional violations of law); Wasserman v. Agnastopoulos, 22 Mass.App.Ct. 672, 681 (1986) (intentional employment of sharp practices). Another *369 definition has been proffered by the federal court. There a subjectively culpable state of mind with respect to actions that are unfair or deceptive has been utilized. Computer Systems Engineering, Inc. v. Qantel Corp., 571 F.Sup. 1365, 1374 (D.Mass. 1983). See Kattar v. Demoulas, 433 Mass. 1, 16 (2000) (multiple damages led to defendant’s degree of culpability). Although such states of mind clearly encompass reckless behavior, Montanez v. Bagg, 24Mass.App.Ct. 954, 956 (1987), negligent acts are not the subject of punitive, multiple damages awards. Anzalone v. Strand, 14 Mass.App.Ct. 45, 49 (1982); M.P.S. Vol. 52, M. Gilleran The Law of Chapter 93A, §11.9 (2d ed. 2007) (“A negligent violation is not a willful or knowing violation”) .
Here, although ServPro’s own written materials advised its employees to take additional precautions, I do not find the level of culpability required under §9 for multiple damages. All witnesses from ServPro testified to their belief in the non-hazardous nature of SaniPro II. They testified to not wearing any breathing masks or respirators when applying the product and actually using SaniPro II to wash and disinfect their equipment, as well as their own hands, upon the completion of their tasks. Moreover, none of the Serv-Pro witnesses had ever heard of anyone developing medical problems as a result of exposure to SaniPro II. Despite the link between QUATS exposure and respi-ratoiy difficulties appearing in the medical literature, I find, based upon the testimony of both experts (Drs. McCunney and Saiyan) that asthma develops only infrequently. Accordingly, I do not find that defendants’ actions were knowing or willful violations of G.L.c. 93A, §§2, 9. Similarly I do not find defendants’ failure to tender a reasonable offer of settlement upon receipt of the c. 93A demand letter to equate to a knowing or willful unfair act or practice. I find defendants’ response was not made in bad faith. See, Stark v. Patalano Ford Sales, Inc., 30 Mass.App.Ct. 194, 204 n.9, 205 (1991). The insurer’s response made on behalf of defendant indicating a need on its part to “thoroughly investigate this matter and determine if your allegations have any merit,” was reasonable under the circumstances existing at that time.
ORDER
I find for the plaintiff Phyllis Maston against the defendants Paul Poirier and Jane Poirier, d/b/a ServPro of Fitchburg-Leominster, in the amount of $267,248.67, plus costs and attorneys fees.
I find for the plaintiff Douglas Maston against the defendants Paul Poirier and Jane Poirier, d/b/a ServPro of Fitchburg-Leominster, in the amount of $5,000, plus costs and attorneys fees.
Plaintiffs shall have fourteen (14) days to submit a motion, with appropriate affidavits, for costs and attorneys fees. Defendants shall have ten (10) days thereafter to file opposition.

Although it is possible that a solution of the ServPro product “Cherry Fog” was also mixed and sprayed in some capacity at the Maston home, the testimony on this point is unclear. A specific finding on this point is not necessary to the determination of the outcome of this case as neither ServPro cherry product is a QUAT. The confusion arises out of the distinction between ServPro 311, Cherry Fog Deodorant and ServPro 335, Cherry Fog Deodorizer. While the cherry fog deodorant can be sprayed in the same manner as SaniPro II and can be “added to water based cleaners to add a fragrance if desired”; the cherry fog deodorizer cannot Adding to the confusion, both the cherry fog deodorizer and the cherry fog deodorant may be used with the Fog Generator unit, which was not kept on the ServPro trucks and was only used by Mr. Poirier and Mr. Bustin. Both Mr. Poirier and Mr. Bustin testified that the Fog Generator was never brought to or used at the Maston premises. Both Mr. and Mrs. Maston testified to the strong cherry aroma within their basement for days following the clean-up.

Dr. Castellanos stated in his report of June 2, 2009: “In my professional opinion and with a reasonable degree of medical certainty, after reviewing Mrs. Maston’s records and evaluations by other specialist during the last 10 years, her symptoms are more likely than not a result of exposure to ammonium chloride that she sustained back in June of 1999 while her basement was being cleaned, this led to the well described condition of reactive airways disease a subset of asthma and her current symptoms.”

Additionally, to “conform with applicable federal, state and local regulations or law,” ServPro cautioned: “Do not spray in occupied buildings. Occupants should not re-enter the building after spraying until safe to do so. Advise property owners of their right to know about products applied in their home or work place.” Manual at 6-13.