625 A.2d 349

**Margaret C. SMITH, Personal Representative of the Estate of Clater W. Smith, Jr., et al.**

v.

**A. Austin PEARRE, Jr., et al.**

**No. 1500, Sept. Term, 1992.**

Court of Special Appeals of Maryland.

June 2, 1993.

378

Marvin Ellin (Jack D. Lebowitz, May–Lis Manley and Ellin & Baker, on the brief), Baltimore, for appellants.

Ronald U. Shaw (Jeffrey G. Cook and Shaw & Brown, P.A., on the brief), Towson, for appellee, Pearre.

Susan T. Preston (Goodell, DeVries, Leech & Gray, Donald L. DeVries, Jr., and Carol L. Nicolette, on the brief), Baltimore, for appellee, Winnan.

Argued before BLOOM and FISCHER, JJ., and JAMES S. GETTY (retired), Specially Assigned.

BLOOM, Judge.

Margaret C. Smith, individually as surviving spouse of Clater W. Smith Jr., deceased, and as personal representative of her late husband's estate, appeals from the judgment of the Circuit Court for Frederick County that was entered upon a jury verdict in favor of appellees, Drs. A. Austin Pearre Jr. and Gerald R. Winnan and Gerald R. Winnan, M.D., P.A., in a medical malpractice action. Appellants assert error by the trial court

1. in denying their request for removal;
2. in denying their request for a new trial because the jury foreman, during the trial, violated the court's admonition not to watch media presentations involving the subject of malpractice;
3. in denying their request for a new trial because one of the jurors failed to answer voir dire questions truthfully;
4. in denying their request for a jury instruction to the effect that a patient who relies on a negligently arrived at diagnosis and, based on that diagnosis, does not return for a follow-up visit is not contributorily negligent; and

5. in not permitting a professor of surgery to express an opinion as to standards of care for practitioners of internal medicine and gastroenterology.

Perceiving no reversible error, we shall affirm the judgment of the circuit court.

## Factual Background

The decedent, Clater W. Smith, became an associate judge of the Circuit Court for Frederick County on 31 May 1985. He was ultimately appointed administrative judge for that county. On 14 February 1988 Judge Smith noted rectal bleeding during a bowel movement. Later he experienced more severe rectal bleeding, which caused him to faint. His physician, appellee A. Austin Pearre Jr, an internist, instructed him to go to Frederick Memorial Hospital.

By the time Judge Smith was admitted to the hospital, he had lost so much blood that he required a transfusion. Appellee Gerald R. Winnan, a gastroenterologist, was called in as a consulting specialist. Judge Smith underwent a colonoscopy to determine whether any benign tumors, malignant tumors, or other pathologies were present in his colon. The colonoscopy revealed the apparent source of the bleeding to be a diverticulum (an out-pouching) in the colon. A lower gastrointestinal (GI) study disclosed no active bleeding. Appellees diagnosed Judge Smith as suffering from diverticulosis, a disorder with which Judge Smith was familiar because several of his friends had suffered from the same problem.

Judge Smith was discharged from the hospital on 21 February 1988 by Dr. Pearre's partner, Dr. Smith. At that time, Judge Smith understood or believed that he should again seek treatment from appellees only if the bleeding recurred. A year passed without incident. On 17 March 1989 Judge Smith suffered a similar bleeding episode and was again rushed to the emergency room. This time both upper and lower gastrointestinal series were performed; the upper GI series

disclosed an ulcer in the stomach, which was biopsied and diagnosed as cancerous.

On 6 April 1989 Judge Smith received treatment at The Johns Hopkins Hospital. A surgical procedure revealed that the leiomyosarioma (a type of cancer) of the stomach had metastasized to the diaphragm and throughout his body. Judge Smith died of cancer on 13 March 1991. Appellants produced evidence at trial to establish "with a high degree of medical probability" that if the cancerous ulcer had been detected by an upper GI study in February 1988 Judge Smith's cancer could have been cured.

Judge Smith and his wife filed a claim against appellees under the Health Care Malpractice Claims Act, Annotated Code of Maryland, Courts and Judicial Proceedings Article, §§ 3–2A–01 through 3–2A–09. Both appellees denied liability, and Dr. Pearre requested a change of venue. The case was moved to Harford County for a Health Claims Arbitration proceeding. Thereafter, the parties waived arbitration, and a complaint was filed by the Smiths in the Circuit Court for Frederick County on 4 February 1991. They also filed, at the same time, a petition to remove the case from Frederick County to a noncontiguous county, specifically, to Prince George's County, Baltimore City, or Baltimore County.

On 7 March 1991 appellee Pearre requested that Chief Judge Robert Murphy of the Court of Appeals temporarily assign a judge from another county to preside over the case before the Circuit Court for Frederick County, pursuant to the Maryland Constitution, Art. IV, § 18(b), Md. Rule 1200.-a.1, and Md. Rule 1202.a.1. Chief Judge Murphy appointed Judge Francis Arnold, of the Circuit Court for Carroll County, to preside over the case.

Appellants assert that on or about 3 June 1991 LaVonna Vice, co-counsel for appellants, received a telephone call from Judge Arnold's secretary, requesting some dates for a hearing to determine "whether the Smith case will be tried before a

jury in Frederick County or Carroll County."[1]  Counsel for appellants concluded that Judge Arnold had prejudged the motion and had already decided that the trial would be held in either Frederick or Carroll counties.

Appellants withdrew the removal petition on 12 July 1991, claiming that Judge Arnold had already made a predetermination of where the case would be tried.  On 10 March 1992, one month and four days before the scheduled trial date, they filed a petition for the recusal of Judge Arnold, but within a week, on 16 March 1992, withdrew their recusal motion and filed a second petition for removal.  Judge Arnold presided over a hearing on the new removal request on 7 April 1992 and denied the request.  Judge Arnold again denied a renewed motion for removal on 13 April 1992, and the case proceeded to trial the following day.

### Removal

Appellants initially requested that the case be removed to a county noncontiguous to Frederick County in part because the principal plaintiff, Judge Smith, had served as administrative judge for the Circuit Court for Frederick County, and because appellees might have patients in counties contiguous to Frederick County, That initial request for removal, filed on 4 February 1991, was withdrawn on 12 July 1991 as the result of a telephone call that led appellants' counsel to believe that Judge Arnold had already decided not to remove the case any further than the adjacent county.  A second motion requesting that the case be removed to a noncontiguous county was filed on 16 March 1992.

When Judge Arnold denied appellants' second request for removal, shortly before the scheduled trial date, he ruled that if an impartial jury could not be empaneled he would revisit the issue.

---

1.  There is nothing in the record reflecting the telephone call or its contents, other than appellants' counsels' repeated assertions that it took place.

■ Appellees contend that, by withdrawing their original request for remand, appellants waived their right to seek removal. While the right of removal may be waived or surrendered, *State v. Simms*, 234 Md. 237, 198 A.2d 891 (1964), we believe that under the facts of this case appellants did not waive the right. We reject appellees' contention that once the issue of removal was raised, via the original request, it cannot be raised later a second time. Rule 2–505(a)(1) provides:

> In any action, and on issues from the Orphans' Court, any party may file a motion for removal accompanied by an affidavit alleging that the party cannot receive a fair and impartial trial in the county in which the action is pending. If the court finds that there is reasonable ground to believe that the allegation is correct, it shall order that the action be removed for trial to a court of another county. Any party, including a party who has obtained removal, may obtain further removal pursuant to this Rule.

The rule unambiguously states that the removal issue may be raised more than once. *See also Seth v. Chamberlaine*, 41 Md. 186 (1874).

The right of removal afforded under Courts and Judicial Proceedings Article § 6–204, Md.Code Ann. (1974, 1989 Repl. Vol.), and the Maryland Constitution art. IV, § 8, entitles a party to have a case removed to a court in another jurisdiction if the party can demonstrate that a fair and impartial trial is impossible in the court where the action was initially brought. *Ezersky v. Ezersky*, 40 Md.App. 713, 715, 394 A.2d 1225 (1978).

■ The discretionary power of the courts to remove a case originates from the common law of the King's bench:

> It has always been held, that the county courts in this State, being the only courts of record with original common law jurisdiction, can rightfully exercise all the powers exercised in *England*, by the court of King's bench, so far as these powers are derived from rules and principles of the common law, and so far as the same are suited to the change in our

political institutions, and are not modified by our constitutional or statutory enactments.

That the court of King's bench has rightfully exercised this power of removal as an acknowledged, if not essential part of its ordinary common law jurisdiction, both in respect to criminal and civil cases, does not seem to have been doubted in any cases in which its exercise is reported to us.

*Price v. State,* 8 Gill 295, 310–11 (Md.1849).[2] The constitutional provision granting removal is liberally construed, *Greenberg v. Dunn,* 245 Md. 651, 657, 227 A.2d 242 (1967), *overruled by Parrott v. State,* 301 Md. 411, 483 A.2d 68 (1984), and may be enlarged although not restricted by the legislature.[3] *Barnes v. Meleski,* 211 Md. 182, 187, 126 A.2d 599 (1956). *See Shreffler v. Morris,* 262 Md. 161, 167, 277 A.2d 62 (1971). The manner in which the right of removal may be employed is similarly well defined:

It is equally well settled, however, that the right can be exercised only once, *Price v. State,* 8 Gill 295 (1849); that it may be expressly surrendered or waived, *State v. Simms,* 234 Md. 237, 198 A.2d 891 (1964); *Caledonia Fire Ins. Co. of Scotland v. Traub,* 86 Md. 86, 37 A. 782 (1897); or having been asserted may be withdrawn before removal, *Seth v. Chamberlaine,* 41 Md. 186, 194 (1874), and then renewed but only during the term in which the suggestion was stricken ...

*Shreffler v. Morris,* 262 Md. at 167, 277 A.2d 62. Generally "the removal must be made before the trial or any part of it is commenced in the court ordering the removal." *Cooke v. Cooke,* 41 Md. 362 (1875). *See also Anne Arundel Co. v. Lichtenberg,* 263 Md. 398, 283 A.2d 782 (1971).

---

**2.** *See also Crocker v. Justices of Superior Court,* 208 Mass. 162, 94 N.E. 369, 371–73 (1911), tracing the common law precedent for removal.

**3.** The statutory authority to remove cases dates back to 1805 and was intended as implementation of the Maryland Constitutional provision. *See Lennox v. Mull,* 89 Md.App. 555, 561, 598 A.2d 847 (1991).

■ Once a party has demonstrated that he or she cannot receive a fair and impartial trial in the court in which the action is pending "the case should be removed in the sound exercise of judicial discretion." *Firstman v. Atlantic Constr. & Supply Co.*, 28 Md.App. 285, 299, 345 A.2d 118 (1975).[4] This power of removal may only be exercised when "a party cannot otherwise have a fair and impartial trial. It cannot be exercised for any other reason." *Ezersky v. Ezersky*, 40 Md.App. 713, 171, 394 A.2d 1225 (1978).

As recognized by the Court of Appeals in *Greenberg v. Dunn*, 245 Md. 651, 654, 227 A.2d 242 (1967), the purpose of removal is to ensure that parties receive a fair and impartial trial:

> The object was to get rid of the influence of local prejudice in the community from which the jury to try the case was to come, and thus, as far as practicable, to secure a fair and impartial trial by jury. *Cooke v. Cooke*, 41 Md. 362, 372 (1875).

*See also Mayor of Baltimore v. Libowitz*, 159 Md. 28, 31, 149 A. 449 (1930). In *Greenberg* the Court concluded that both actions heard by a court and actions heard by a jury are susceptible of removal. *Id.* 245 Md. at 660, 227 A.2d 242.

■ Appellants' argument for removal is essentially three-fold. They suggest that an impartial jury trial was impossible in Frederick County due to 1) the small number of practicing internists and gastroenterologists in Frederick County, (2) Judge Smith's prominence in the community as administrative judge, and 3) the media coverage of the suit by *The News*, a

---

**4.** Where to move a case is within the exercise of judicial discretion, not whether removal is appropriate. As noted by this court in *Lennox v. Mull*, 89 Md.App. 555, 560, 598 A.2d 847 (1991), "[i]f the condition for removal is satisfied, there is no discretion to deny the request." *See also Davidson v. Miller*, 276 Md. 54, 83, 344 A.2d 422 (1975), *overruled by, Parrott v. State*, 301 Md. 411, 483 A.2d 68 (1984) ("a judge who orders the removal of an action has discretion in determining the precise court within or without the circuit to which the case will be sent and reversal will follow only when the record discloses clear abuse of that judgment").

Frederick paper. Appellants couch the litigation as a conflict between the county's administrative judge and local physicians. To succeed on that argument appellants must demonstrate that they could not receive a fair and impartial trial in Frederick County. We agree with Judge Arnold's conclusion that appellants' arguments fall short of the requisite proof.

The fact that Frederick County hosts a population of only 150,208, some 40,148 of whom reside in the City of Frederick, does not in and of itself prevent appellants from empaneling an impartial jury. The legislature has indicated a strong preference for such actions to be brought in "a county where the defendant resides, ... [or] is employed." Md.Code Ann., Cts. & Jud.Proc. § 6–201 (1957, 1989 Repl.Vol.). *See also Eastham v. Young,* 250 Md. 516, 518, 243 A.2d 559 (1968). Addressing the first component of appellants' argument, we note that although a small number of internists and gastroenterologists practice in Frederick County, that fact did not preclude the parties in this case from empaneling an impartial jury. Most smaller counties in the state also lack substantial numbers of medical specialists, a fact that does not automatically compel removal of an action against one of them. Because the purpose of removal is to eradicate local prejudice from the jury, voir dire may be used to weed out prospective jurors who are subject to such prejudice.

> Certainly a voir dire examination will satisfactorily determine whether the prospective juror would be outwardly influenced to the prejudice of the petitioners, and if so, then a challenge either for cause or peremptorily, may be utilized to eliminate that person from the panel.

*Davidson v. Miller,* 276 Md. 54, 84, 344 A.2d 422 (1975).

In this case, potential jurors who knew Judge Smith or who were treated by Dr. Winnan were struck for cause by Judge Arnold. In addition, nineteen of the twenty potential jurors who had heard of or been treated by Dr. Pearre or his medical colleagues at Internal Medicine Associates were also struck

for cause.[5] Appellants have failed to demonstrate that an impartial jury could not be empaneled because of the limited number of medical specialists practicing in Frederick County.

Appellants have similarly failed to show the juror partiality allegedly caused by Judge Smith's prominence in the community. Because potential jurors who knew Judge Smith or had an association with him were struck from the panel for cause, an impartial jury was realizable. The media coverage of the case did not, apparently, intrude on the life of every Frederick County citizen so as to preclude the possibility of selecting an impartial jury. We find appellants' demonstration of inherent partiality and irreparable taint of the juror pool to be insufficient and conclude that the voir dire examination addressed any potential prejudice and partiality. We find no error in the lower court's refusal to remove the case to a county noncontiguous with Frederick County.

The problem of having a fellow judicial colleague preside over the case was addressed by the order of Chief Judge Murphy appointing Judge Arnold, of the Circuit Court for Carroll County, to preside over the case. We find in the law no actual or implied absolute right of removal for a circuit court judge involved as a party in a civil jury trial. A plaintiff or defendant who also happens to be a judicial officer of the court must meet the same threshold requirements as any other party seeking removal. Because we find that appellants failed to show that a fair and impartial jury could not be empaneled, we need not reach the issue of whether appellants waived their right of removal by withdrawing their original request and then waiting until just before the scheduled trial date to renew it.

### Viewing of "60 Minutes" by Jury Foreman

Maryland law has long held that a juror may not impeach his or her verdict, whether the offensive conduct be misbehavior or mistake. *Oxtoby v. McGowan*, 294 Md. 83, 101, 447

---

5. The twentieth potential juror was not selected to serve on the jury.

A.2d 860 (1982); *Wernsing v. General Motors Corp.*, 298 Md. 406, 411, 470 A.2d 802 (1984); *Harford Sands Inc. v. Groft,* 320 Md. 136, 577 A.2d 7 (1990). *See also Eades v. State,* 75 Md.App. 411, 416–19, 541 A.2d 1001, *cert. denied,* 313 Md. 611, 547 A.2d 188 (1988). For a recitation of the law, *see Wernsing,* 298 Md. at 412, 470 A.2d 802.[6] In part, this venerable rule attempts to avoid the "harassment of jurors by disgruntled losing parties; removal of an element of finality from judicial decision; and through allowing jurors to swear to alleged examples of reprehensible conduct, a decrease in public confidence in the judicial process." *Harford Sands,* 320 Md. at 145, 577 A.2d 7, citing *Williams v. State,* 204 Md. 55, 67, 102 A.2d 714 (1954).

What appellant's counsel did in this case—employing an investigator to question the jurors in the hope of finding some basis for impeaching their verdict—is precisely what the rule attempts to avoid. Jurors should not be subject to such harassment, and the finality of judgments entered upon their verdicts should not be subject to such attacks, because these tactics do tend to erode public confidence in the judicial process.

■ In cases involving juror error, misconduct, or mistake, consideration of a motion for new trial based upon that conduct requires a proper balancing. As Judge Rodowsky noted in *Wernsing:*

> Where ... the precise extraneous matter is known but direct evidence as to its effect on the deliberation is not permitted, a sound balance is struck by a rule which looks to the probability of prejudice from the fact of the extraneous matter in relation to the circumstances of the particular case. It is the function of the trial judge when ruling on a motion for a new trial to evaluate the degree of probable prejudice and whether it justifies a new trial. That judgment will not be disturbed but for an abuse of discretion.

---

**6.** This rule is derived from the Lord Mansfield's opinion in *Vaise v. Delaval,* 1 Term R. 11 (K.B. 1785). *See Eades v. State,* 75 Md.App. 411, 416, 541 A.2d 1001 (1988).

298 Md. at 419–20, 470 A.2d 802. In making this assessment the trial court endeavors to balance the "right to a fair trial with the policy prohibiting impeachment by a juror of the verdict." *Id.* at 419, 470 A.2d 802. Reversal of the lower court should occur only where a plain abuse of discretion has resulted in palpable injustice. *Joseph F. Hughes & Co. v. Stockhausen,* 212 Md. 559, 563, 129 A.2d 844 (1957). "The trial judge's discretion extends to matters concerning juror misconduct or other irregularity in the conduct of others which may affect the jury." *Eades,* 75 Md.App. at 420, 541 A.2d 1001, quoting *Walker v. Hall,* 34 Md.App. 571, 591, 369 A.2d 105 (1977).

■ In the instant case, a juror allegedly violated the court's instruction that all jurors refrain from watching or listening to local television and radio. On 27 April 1992 Judge Arnold instructed the jury as follows:

I will remind you, as I must, that you should not look at television or listen to radio or news broadcasts concerning any medical trials or any medical subjects and do not discuss this case with anyone, including your fellow jurors.

Later, on 1 May 1992, the jury was again admonished with respect to reading newspapers, listening to the radio, or watching television:

Please do not listen to any news broadcasts or read anything about this case or medicine in general or anything about civil suits and do not discuss this case with anyone, including your fellow jurors.

The evidence presented at the hearing on the motion for new trial revealed that the May 10th "60 Minutes" program included a segment on physicians who had left the profession.[7]

---

**7.** Dialogue during the program included the following colloquy:
MR. SCHAROFF: And the physicians would come down and talk to me about being careful how I dictated my reports. "Don't recommend too many studies, other studies, because if you recommend them on one hand, the insurance company or the hospital will say you can't do this. On the other hand, if it's in a report, and it's—becomes a lawsuit, and we haven't done the test ..."

Several days after the verdict, appellants' counsel learned of the "60 Minutes" program and engaged the services of an investigator to conduct a telephone survey of the jurors. The survey revealed that the jury foreman had watched the program in question. Appellants now claim that the statements made during the program "would apply as a defense and as an excuse for not performing an upper GI series" and suggests a high possibility of prejudice that mandates a new trial. We disagree.

The jury foreman's observance of the program constitutes extraneous material that occurred outside the sanctity of the jury room. *See Harford Sands*, 320 Md. at 145, 577 A.2d 7. Therefore, evidence of the foreman's observance of the program may be properly considered by the trial court, but the court may not consider what occurred during jury deliberations. *Id.* In determining whether "the extraneous matter could have a tendency to influence the jury in arriving at its verdict in a manner consistent with the legal proofs and the court's charge," *Wernsing*, 298 Md. at 419, 470 A.2d 802, quoting *Palestroni v. Jacobs*, 10 N.J.Super. 266, 77 A.2d 183 (1950), we find the rationale of the Court of Appeals in *Harford Sands* to be instructive. In *Harford Sands*, Judge Adkins pointed out that the Court did not know whether the jury had applied the information obtained in violation of the trial court's instruction or made the information available to other members of the jury. *Harford Sands*, 320 Md. at 147, 577 A.2d 7. Likewise, we do not know whether the jury foreman took the "60 Minutes" segment to mean that the upper GI series was unnecessary.

---

MR. SAFER: The lawyers will say why didn't you do it?

MR. SCHAROFF: The lawyers will say, "Why didn't you do it?"

MR. SAFER: (Voiceover) A Catch–22. Many doctors feel immobilized by it, trapped by insurers' dictates, lawyers' threats and hospital administrations' bean counters.

MR. HENDRIX: ... What's happening now is—is that money has become so important to everyone involved—patient, doctor, lawyers, insurance company, the hospital administrator—that's what's generating the system.

The "60 Minutes" program apparently sought to explore why medical doctors leave the profession—one explanation is that doctors end up caught in between insurance companies and attorneys. A program of this type might suggest to an observer that attorneys are to blame for the disenchantment of the medical profession. But, whether the upper GI test should have been performed under the applicable standards of medical care was a question upon which much testimony and evidence was presented at trial. Whether the jury chose to believe that testimony is entirely another question.

Keeping in mind that we must balance "the probability of prejudice from the fact of the extraneous matter in relation to the circumstances of the particular case," we conclude that while it was *possible* that the "60 Minutes" segment influenced the jury foreman we are not convinced that it *probably* resulted in prejudice. We find no abuse of discretion in the trial court's decision to deny a motion for new trial. *Compare Braun v. Ford Motor Co.*, 32 Md.App. 545, 550–51, 363 A.2d 562 (1976) (juror who knew member of law firm representing appellee not asked to disclose acquaintance during voir dire).

### *Failure to Reveal Personal Philosophy in Voir Dire*

At the hearing on their motion for a new trial, appellants proffered that, after the trial, an investigator hired by their counsel engaged one of the jurors in conversation and the juror said, "I don't believe in suing people. Mistakes are made."

Appellants contend that the failure of one juror to reveal during voir dire his personal philosophy against "people suing people" and that "mistakes are made" deprived them of an automatic disqualification of that juror for cause and infringed upon their right to a fair trial. We disagree. We first note that this issue is not preserved for our review because it was not included in appellants' motion for new trial. Maryland Rule 2–533 provides that a motion for new trial may be filed within ten days after entry of judgment and that "all grounds advanced in support of the motion shall be filed in writing

within the time prescribed for the filing of the motion, and no other grounds shall hereafter be assigned without leave of the court." Therefore, we are not obligated to address this issue on its merits. We choose to do so because very little Maryland case law exists on this subject. In *Braun v. Ford Motor Co.*, 32 Md.App. 545, 363 A.2d 562 (1976), following the verdict, appellants' counsel telephoned the jurors at home and determined that misconduct had occurred. Apparently one juror had a newspaper article clipping in her pocketbook discussing the emotional stresses on women during menopause. Counsel alleged that the similarity between the emotional symptoms and the symptoms described by appellant impaired the credibility of appellant's testimony. Additionally, one of the jurors was a widow of a former district court judge and was acquainted with a member of the law firm representing appellees. In its opinion, this Court noted that at no time during the voir dire examination did counsel or the judge ask for a disclosure of such an acquaintance. *Id.* at 551, 363 A.2d 562. In the instant case, no question required a potential juror to reveal either personal philosophy or opinions regarding lawsuits.

Appellants argue that Judge Arnold's request that the jurors reveal anything that might influence them in rendering a verdict makes the juror's failure to reveal his personal philosophy a deception. We disagree. Prior to that question, nothing else had been asked that would have indicated to the juror that his personal philosophy would prevent him from being impartial. It is entirely possible that the juror thought that he was capable of impartiality despite his dislike of lawsuits and his personal belief that people generally should not sue each other. On the basis of the record before us, we are unable to conclude that the juror deceived counsel.[8] *See also Murphy v. Board of County Comm'rs*, 13 Md.App. 497, 513, 284 A.2d 261 (1971) (holding that potential juror's employ-

---

**8.** While the District of Columbia's Court of Appeals' decision in *Cowden v. Washington Metro. Area Trans. Authority*, 423 A.2d 936 (D.C.App. 1980) is instructive it is not legal precedent within our jurisdiction and we are under no compulsion to follow its teachings. Furthermore *Cowden* and the case at bar may be distinguished on the facts.

ment was revealed on jury list). We believe that the trial court properly exercised its discretion in refusing to grant appellants' motion for new trial based on this juror's alleged deception during voir dire.

### Request for Jury Instruction

Appellants' claim that the court's failure to give a requested instruction based upon *Chudson v. Ratra,* 76 Md.App. 753, 548 A.2d 172 (1988), *cert. denied,* 314 Md. 628, 552 A.2d 894 (1989), was in error. The *Chudson* case addressed an issue as to whether a patient's contributory negligence must be concurrent with or subsequent to a physician's negligence in order to bar recovery. In *Chudson,* we adopted the principle expressed in 70 C.J.S. *Physicians and Surgeons* § 80(c):

A patient who, after receiving treatment, fails to return to the physician or surgeon for further treatment, as instructed, is guilty of contributory negligence preventing recovery for injurious consequences from such failure. However, where the physician considers the treatments ended, and does not instruct the patient to return, the patient is not chargeable with negligence for failure to return.

*Chudson,* 76 Md.App. at 773–74, 548 A.2d 172. We specified that the test for contributory negligence is not "simultaneity but whether the plaintiff's dereliction has significantly contributed to the injury." *Id.* at 774, 548 A.2d 172. We were careful to explain that breast cancer in particular requires the patient, upon instruction from her physician, to engage in periodic examinations and to report any suspicious changes or lump developments; the law of contributory negligence will not excuse patients who have been so instructed by their physicians, after detection of a condition that the doctor has indicated should be monitored, from failing to meet these self-examination requirements.

In the instant case, appellants requested that the court give the following contributory negligence instruction to the jury, and they now assert that the court's failure to give the instruction was in error:

> If a patient is given a negligently arrived at diagnosis on which the patient relies and believes that his condition is a minor and/or benign condition and free from any danger, and further, should you find that relying upon the purported minor nature of the diagnosis given the patient, that patient does not return for any additional visits, then I instruct you that the physicians, the Defendants in this case, cannot rely on contributory negligence ...

In addressing this issue we must determine whether the requested instructions were fairly covered by the instructions actually given. *Myers v. Estate of Alessi,* 80 Md.App. 124, 132, 560 A.2d 59, *cert. denied,* 317 Md. 640, 566 A.2d 101 (1989). In the case at bar, the jury was instructed that, if a patient is told by the doctor to return and fails to, then he may be charged with contributory negligence; if the doctor does not tell a patient to return, then the patient is not contributorily negligent.[9] We believe that the instructions given by the court adequately covered the material contained in appellants' proposed instruction. Thus, the court's decision to refuse to give appellants' requested instruction was not in error.

### Expert Testimony

■ Appellants also contend that the trial court's exclusion of testimony by Dr. Charles F. McKhann, M.D., Professor of Surgery at Yale University School of Medicine, was in error. We believe, based upon Dr. McKhann's own admission regarding his practice and knowledge of the fields of gastroenterology and internal medicine, that the exclusion of the testimony was proper. The trial court did not permit Dr. McKhann to

---

9. The actual instructions given were as follows:

   You are instructed that a patient who, after receiving treatment, fails to return to the physician for further treatment as instructed, is guilty of contributory negligence, preventing recovery for the injurious consequence from such failure. However, where the physician considers the treatments ended and does not instruct the patient to return, the patient is not chargeable with negligence for failure to return.

express an opinion regarding the standard of care used in internal medicine and gastroenterology for locating the source of gastrointestinal bleeding.

Appellants presented the testimony of eight expert witnesses, Drs. Trelstead, Stein, Battle, McKhann, Decosse, Bonadona, De Silva, and Morse, four of whom expressed opinions as to the appropriate standard of care. Appellees argue that the testimony of Dr. McKhann on the standard of care would merely be additional cumulative evidence under Maryland Rule 8–503(f). The fact that Dr. KcKhann is a cancer surgeon specialist may have bolstered appellants' case; nevertheless, we find that the exclusion of the testimony was proper for other reasons.

During both deposition and trial, Dr. McKhann testified that he did not perform colonoscopies or endoscopies [10] and is unfamiliar with the appropriate standard of care applied to gastroenterologists and internists:

Q. I don't mean, sir, to imply that you don't have your own experience and please don't interpret my question that way. My question, though, was whether, with regard to the matters—for example, I'll read you from page 116 of your deposition to refresh your recollection.

"Question: So you're not prepared to render an opinion to a reasonable medical probability that standards of care of gastroenterologists nationwide would require an upper endoscopy to be done if the site of bleeding is identified?

Answer: I think that the gastroenterologists would have to speak for themselves with that.

Question: You're not going to render an opinion about that?

Answer: No."

Do you recall that testimony sir?

A. I recall that testimony.

---

**10.** The doctor testified that he has been present "at many colonoscopics in order to see what the pathology is."

Q. And you will stand by that testimony here today?

A. I do not know what the standard by gastroenterologists the country over are. I know what the standards at Yale are. That's all.

Q. Pardon?

A. I know what the standards at Yale are for things like this, but I don't know the country over for gastroenterologists. I have no idea.

Q. So you will agree that you are not prepared to express an opinion on that subject as to the standard of care of gastroenterologists practicing nationwide; is that right sir?

A. I am not prepared to, you're right.

We believe that in evaluating his knowledge of the standards of care for gastroenterologists Dr. McKhann eliminated his own standard of care opinion testimony. If a medical professor is unwilling to offer an expert opinion on the nationwide standard of care for practitioners in fields other than his own, we see no reason to compel him to do so or to find error in the court's refusal to let him testify to that medical standard. While it is well established that a physician may render an opinion on a medical standard of care outside his own specialty, the witness must nevertheless possess the necessary qualifications and sufficient knowledge. *Spence v. Wiles*, 255 Md. 98, 102, 257 A.2d 164 (1969); *Radman v. Harold*, 279 Md. 167, 172 n. 2, 367 A.2d 472 (1977). "We perceive no reason why a person who has acquired sufficient knowledge in an area should be disqualified as a medical expert *merely* because he is not a specialist or *merely* because he has never personally performed a particular procedure." *Radman*, 279 Md. at 171, 367 A.2d 472. Any witness who testifies as an expert, however, must have sufficient knowledge, skill, and experience to make a well-informed opinion. *Id.* at 171 n. 2, 367 A.2d 472.

In the instant case Dr. McKhann is well-qualified as an expert surgeon, and is very familiar with the practices associated with gastroenterology but not, by his own admission, familiar with the standard of care of gastroenterologists na-

tionwide or anywhere else except the Yale University School of Medicine. For this reason we believe the trial court correctly excluded his testimony on this subject.

JUDGMENT AFFIRMED.

COSTS TO BE PAID BY APPELLANTS.

FISCHER, J., dissenting.

I concur with the majority with respect to all issues raised except as to issue I. Since I believe this case should have been removed from Frederick County for trial, I respectfully dissent.

To appreciate fully the necessity for removal in order to ensure a fair and impartial trial, a brief recitation of some facts is helpful. The decedent, Clater W. Smith, Jr., was Administrative Judge of the Circuit Court for Frederick County. Judge Smith had practiced law in Frederick County for twenty-one years prior to his appointment to the bench in 1985. Frederick had a population of 150,208 at the time of the hearing on the motion. Appellant [1] argued that due to Judge Smith's prominence in the community, his activity in civic affairs, his membership in the country club, and his involvement in the church, he was very well known in the county. The appellees are part of a small medical community, are prominent physicians and are also extremely well known. Appellant averred that due to these factors, removal was essential in order to ensure a fair and impartial trial.

At the outset of the litigation, both parties agreed that removal was essential. The Health Claims Arbitration was, therefore, removed to Harford County. After waiver of Health Claims Arbitration, suit was filed. Appellees decided that they wanted the case tried in Frederick County, while

---

1. Originally, Judge Smith filed the complaint along with his wife, Margaret C. Smith. Judge Smith died shortly thereafter, and Mrs. Smith proceeded with the action in her individual capacity and as personal representative of her husband's estate. For convenience, we refer to Mrs. Smith, in her multiple roles, as appellant.

appellant persisted in trying to obtain removal from Frederick County.

Apparently, because a circuit court judge was a party to this action, this case was handled in a somewhat unusual fashion. Appellees wrote to Chief Judge Murphy on March 7, 1991 and requested that a judge outside of Frederick County be assigned to the case and that the trial be held in Frederick County. In response, Chief Judge Murphy, on April 15, 1991, assigned Judge Francis M. Arnold to hear the removal motion filed by appellant. According to the appellant,[2] Judge Arnold's secretary telephoned one of her attorneys, attempted to arrange a hearing date, and stated that the purpose of the hearing was to determine whether the case would be tried in Frederick County or Carroll County. Since appellant's desire was that the case be tried in a noncontiguous county and since Carroll County borders Frederick County, appellant withdrew her motion on July 12, 1991.

Subsequently, on March 10, 1992, appellant filed with Chief Judge Murphy and with Judge Arnold a petition requesting Judge Arnold's recusal. The petition averred that appellant could not receive a fair trial in Frederick County and claimed that Judge Arnold had prejudged the initial removal petition. Before Chief Judge Murphy addressed the petition, however, appellant withdrew her motion seeking Judge Arnold's recusal.

Approximately one month prior to the trial date, appellant filed a new petition for removal. Among the allegations of the petition were that Judges Dwyer and Stepler, the remaining judges in Frederick County, were to testify at the trial and that it would be virtually impossible to impanel in Frederick County persons who did not have contact with the parties involved. The court denied the motion by written order dated April 8, 1992.

---

**2.** Appellant insisted at oral argument that the circumstances as related were correct, and the judge did not dispute her version. Additionally, appellees do not take issue with appellant as to these facts.

On April 13, 1992, appellant renewed her motion for removal, and, in addition to the prior grounds, cited an article that had appeared in a local newspaper, the *Frederick News,* on April 11, 1992. It is alleged by appellant that the circulation of the *News* approximates the population of Frederick County. Appellant's principal objection to the article was that it incorrectly reported that the complaint stated that an early diagnosis might have saved Judge Smith's life when, in reality, the contention was that an early diagnosis probably would have saved his life. Judge Arnold denied this renewed motion, and the case proceeded to trial in Frederick County.

Prior to the decision of the Court of Appeals in *Davidson v. Miller,* 276 Md. 54, 344 A.2d 422 (1975), citizens of this State enjoyed an absolute Constitutional right of removal of a civil case by filing a suggestion in writing under oath that a fair and impartial trial could not be obtained in the jurisdiction. Section 8 of Art. IV, Constitution of Maryland. In view of the fact that the exercise of the right of removal brought different results in Baltimore City than the exercise in the various counties, the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution was violated.[3] The Court of Appeals solved the Constitutional problem by abolishing the automatic right of removal. *Davidson,* 276 Md. at 82, 344 A.2d 422.

The Court in *Davidson* realized, of course, that it made a far reaching change in the Maryland law, and in reassuring the Maryland Bar stated at 83, 344 A.2d 422:

The effect of this ruling, we hasten to point out, will in no way deprive or otherwise curtail the circuit courts of the counties or the circuit-level civil law Courts of Baltimore City from exercising their common law discretionary power

---

**3.** Since there existed three law courts in Baltimore City, the Superior Court, the Baltimore City Court, and the Court of Common Pleas, cases were removed from one law court to another but still remained in Baltimore City. In the counties, meanwhile, only one law court existed, so cases were removed from one jurisdiction to another. It was this disparate practice that resulted in a violation of the Equal Protection Clause.

(which is subject to appellate review for abuse) to remove an action to another jurisdiction, within or without the circuit, in order to rid the case of any prejudicial barnacles which, because of local prejudice, passion or interest, may have attached; thus as near as is reasonably possible, an action's consideration by a fair and impartial jury can be insured. (Citations omitted.)

The Court of Appeals has consistently held that removal provisions are to be liberally construed. In *Bullock v. State*, 230 Md. 280, 283, 186 A.2d 888 (1962), the Court stated, "[I]t has invariably been held that the removal clauses are to be liberally construed in favor of the right."

The majority is satisfied that appellant's concerns over impaneling an impartial jury were resolved by the use of voir dire. I am not so easily assured. It is my experience that voir dire is a helpful tool, not a panacea. If voir dire were a total remedy, removal would never be necessary. Even removal cannot totally eliminate the possibility of a prejudiced juror, but it certainly improves the odds and is the best solution available.

While it is apparent that appellant unduly complicated the trial judge's decision by insisting on removal to a noncontiguous county, it is clear that appellant was not given the option of removal from Frederick County to any other county, contiguous or noncontiguous, and that appellant at no time refused any offer of removal from Frederick County.

It appears to me that the instant case is one of those rare matters that may present itself every ten to fifteen years that fairly cries out for removal. To refuse removal under circumstances such as these is, in my opinion, an abuse of discretion. If a refusal to remove a case of this compelling nature can be viewed a valid exercise of discretion, as the majority holds, then we have moved from an absolute Constitutional right of removal to an almost nonexistent right of removal subject to the unbridled discretion of the trial judge.