PUBLISH

# UNITED STATES COURT OF APPEALS

Filed 10/28/96

## TENTH CIRCUIT

---

JOHN F. DEASY, JR.,                             )
                                                )
      Plaintiff-Appellee,               )
                                                )
      v.                                )     No. 95-1276
                                                )
UNITED STATES OF AMERICA, Denver                )
Veterans Administration Medical Center (the     )
"Denver VAMC"), Baltimore Veterans              )
Administration Medical Center (the Baltimore    )
VAMC) and Perry Point Veterans Administra-      )
tion Medical Center (Perry Point VAMC),         )
                                                )
      Defendant-Appellant.              )

---

Appeal from the United States District Court
for the District of Colorado
(D.C. No. 91-C-1082)

---

William G. Cole, Attorney (Robert S. Greenspan with him on the briefs), Appellate Staff Civil Division, Department of Justice, Washington, D.C., for Defendant-Appellant.

Joseph J. Mellon, Denver, Colorado, for Plaintiff-Appellee.

---

Before **HENRY, LOGAN** and **BRISCOE**, Circuit Judges.

---

**LOGAN**, Circuit Judge.

The United States appeals from the district court's judgment in favor of plaintiff John F. Deasy, Jr. in his Federal Tort Claims Act (FTCA) suit for medical malpractice. Plaintiff asserted that psychiatrists at Veterans Administration (VA) hospitals committed malpractice when they provided him only psychiatric treatment and failed to refer him for medical treatment of severe edema. He further claimed that as a result of the malpractice he suffers from post traumatic stress disorder (PTSD), which prevents him from being able to receive the care at VA facilities to which he is entitled. The district court heard the case without a jury and found that the VA committed malpractice in Maryland and Colorado. The district court awarded plaintiff $3,993,971, to be placed in a reversionary trust to provide for his future medical needs outside the VA hospital system, with any balance at plaintiff's death reverting to the United States. The court also awarded plaintiff $600,000 damages for pain and suffering--$350,000 for the Maryland occurrence and $250,000 for the Colorado occurrence, the maximum permitted under those states' tort laws.

On appeal, the United States argues that (1) the district court judge erroneously found that the psychiatrists committed malpractice; (2) the $4 million trust for plaintiff's medical treatment outside the VA system was not compensatory for his injuries suffered and therefore was improper; and (3) the district court's award of $600,000 for non-economic damages was excessive.

I

The district court made detailed findings of fact and conclusions of law that we summarize here. Plaintiff is a service-connected, totally and permanently disabled veteran entitled to lifetime hospital and medical services from the VA. He has suffered for almost forty years from idiopathic retroperitoneal fibrosis, or Ormond's disease.[1] Over the years he has required repeated hospitalization for treatment related to his Ormond's disease, and also for psychiatric care.

In a prior FTCA case, plaintiff asserted malpractice for treatment at the VA from December 1976 through July 1980. The district court in that case found that the VA system failed to provide adequate medical care to plaintiff and awarded him $474,000 in damages. See Deasy v. United States, No. 83-M-899 (D. Colo. Dec. 27, 1985); II Supp. App. 383-405. Plaintiff then investigated obtaining private insurance coverage as an alternative to VA services but found he could not obtain coverage for his preexisting condition.

Plaintiff then met with Larry Seidl, M.D., an internist who was chief of staff at the Denver VA hospital, who agreed to become his primary treating physician. When plaintiff was hospitalized in 1987 for a kidney and urinary tract infection, he again

---

[1] Ormond's disease causes scar tissue in the peritoneal cavity which can encase tubular organs or structures between organs, including veins and arteries. It is a cyclical disease which tends to have alternating periods of activity and remission. It is apparently difficult to diagnose; in fact, plaintiff was originally diagnosed with Ormond's disease and Hodgkins disease and was treated for both for some period of time.

became concerned with the quality of his treatment at the Denver VA hospital. Dr. Seidl ultimately drafted a document titled "Important Notice to All Physicians Treating John Deasy" (Dr. Seidl's notice). II Supp. App. 367. The notice contained information about plaintiff's medical history, including his primary diagnosis of idiopathic retroperitonal fibrosis, and briefly outlining the physical and psychiatric treatments he had received. The notice stated that "[w]hat Mr. Deasy justifiably seeks is to obtain the optimum treatment available for his unusual medical condition and to avoid improper and ineffective or harmful treatment - which he has experienced in the past - based on review of his medical records, which include diagnoses, both medical and psychiatric, that are highly suspect, in my opinion." Id. The notice explained that the psychiatric diagnoses in plaintiff's history are highly suspect because

> they have occurred either during a period when his Ormond's disease has been active with secondary renal function impairment and its resulting toxicity; or they have occurred during periods when he was receiving multiple medications including corticosteroids to control the Ormond's disease which became active undiagnosed - to be detected only later when it interfered with other organ functions. From December 1976 through August 1980, his psychiatric diagnoses included chronic schizophrenia, manic-depressive psychosis and organic brain syndrome. It is more than highly probable in my opinion that his mental symptoms resulted from the adverse effects of multiple medications including corticosteroids. During this period, he experienced an active phase of the Ormond's disease initially undetected, which caused common bile duct obstruction and the removal of an acalculus gall bladder. Subsequently the inferior vena cava syndrome developed secondary to the fibrosis. It should be noted here that during periods when the Ormond's disease is active, Mr. Deasy may be highly sensitive to drugs and drug therapy of any kind should be conservative and closely monitored. . . . The toxic side-effects of his underlying disease and its treatment should always receive primary consideration in evaluating Mr.

4

Deasy's mental and emotional symptoms during treatment in the Veterans Administration Department of Medicine and Surgery.

Id. The notice included instructions that it be displayed as the top sheet in each volume of plaintiff's medical records. The notice was signed by Dr. Seidl; however, it did not reflect the signature or concurrence of a psychiatrist.

In December 1989, plaintiff was staying at the Fort George Meade military base near Baltimore, Maryland, when he developed peripheral edema related to Ormond's disease and the inferior vena cava syndrome. Despite plaintiff's use of a diuretic the edema continued to worsen. On December 19, plaintiff decided to leave Fort Meade. Because of the edema, his feet were too swollen to wear his shoes. He decided to load his belongings into his van by taking them out a window so that he could avoid walking in the snow in his bare feet. Military police officers came upon plaintiff as he was using a hunting knife to pry the screen off a window. The military police decided that plaintiff needed medical or psychiatric care and took him to the Fort Meade infirmary. Plaintiff became agitated and uncooperative and was transferred to the Baltimore VA medical center.

Upon arrival at the Baltimore VA, plaintiff was evaluated by psychiatrists and became enraged when despite his requests he was not treated for his edema. During his brief stay at the Baltimore VA, psychiatrist David Barrett, M.D., diagnosed him with bipolar disorder manic psychosis, and prescribed thorazine. Although plaintiff's friend and former treating psychologist, Dr. Thomas Holman, gave Dr. Barrett the notice signed

5

by Dr. Seidl, Dr. Barrett analyzed an electrolyte test and decided that plaintiff's physical condition was not causing the psychiatric disturbance. Dr. Barrett did not prescribe any medication or other treatment for the edema, although he noted that plaintiff's legs were edematous. After a few hours Dr. Barrett decided to transfer plaintiff to the Perry Point VA medical facility, which is primarily a psychiatric facility. As part of the transfer procedure, another psychiatrist, Robert Fiscella, M.D., also examined plaintiff and diagnosed him as acutely manic.

When plaintiff was admitted at Perry Point, yet another psychiatrist, Eapen Abraham, M.D., noted that both of plaintiff's legs and feet were edematous. As with Dr. Barrett, Dr. Abraham read Dr. Seidl's notice but found normal electrolyte levels and concluded plaintiff's physical condition was not causing his psychiatric problems. Plaintiff did not receive a medical consultation until December 22, but even though that examining physician noted plaintiff's edema required attention, he prescribed no medication. Finally on December 28 plaintiff received a one-time dose of Lasix, a diuretic. The next day plaintiff fled Perry Point because he was afraid he would have life-threatening renal failure if he did not receive proper medical care.

Plaintiff returned to Denver, and was admitted in two private psychiatric hospitals. On January 29 he transferred to the Denver VA. Jay Griffith, M.D., a psychiatry resident, examined him. Dr. Griffith read but disagreed with the contents of Dr. Seidl's notice; he diagnosed plaintiff as suffering from "bipolar disorder manic phase." App. 188. Dr.

6

Griffith continued plaintiff on Lasix, and set up a medical consultation for him. Plaintiff, however, left the Denver VA the next day because he wanted to get treatment for the edema, which had caused marked abdominal distension.

On January 30, plaintiff's friends arranged an appointment with Russell Simpson, M.D., a private internist, who testified that plaintiff had "one of the worse cases of edema that [he'd] seen." II Supp. App. 308. Dr. Simpson treated the edema with intervenous diuresis in the hospital; after three days plaintiff was discharged in stable physical and psychiatric condition.

In May 1990, plaintiff sought psychiatric treatment from Richard Rewey, M.D., a psychiatrist who had evaluated him in 1984. Dr. Rewey testified at trial that plaintiff suffered PTSD as a result of VA treatment that was the subject of plaintiff's first FTCA suit. Dr. Rewey testified that the VA's treatment of plaintiff in December 1989 and January 1990 caused a flare-up of his PTSD in December 1990, requiring psychiatric treatment.

The district court noted that doctors who had treated plaintiff for more than a few days agreed that his psychiatric problems were at least partly caused by organic abnormalities, while doctors who had only briefly examined him or his records diagnosed him with bipolar disorder. It noted that even with this diagnosis, medications for bipolar patients were not prescribed for plaintiff. The district court then found that plaintiff suffered PTSD in reaction to improper treatment in the VA hospitals. The court determined that

7

because plaintiff's "well-founded fear of maltreatment in the V.A. system actually causes or precipitates serious psychiatric problems . . . provision must be made for [plaintiff] to receive medical and psychiatric treatment outside the V.A. system." App. 63.

II

The United States contends the district court's finding that the VA doctors committed malpractice was clearly erroneous. Because this is an FTCA case we apply the law of both Maryland and Colorado where the alleged malpractice occurred. Under Maryland law a prima facie case of medical malpractice consists of "(1) determining the applicable standard of care, (2) demonstrating that this standard has been breached, [and] (3) developing a causal relationship between the violation and injury." Muenstermann v. United States, 787 F. Supp. 499, 520 (D. Md. 1992). In Colorado, "[t]o establish a prima facie case, the plaintiff must establish that the defendant failed to conform to the standard of care ordinarily possessed and exercised by members of the same school of medicine practiced by the defendant." Melville v. Southward, 791 P.2d 383, 387 (Colo. 1990).

The United States asserts that the district court finding of malpractice rested on a determination that the VA hospitals failed to properly treat plaintiff's edema, which contributed to his psychosis and PTSD and ultimately rendered him incapable of utilizing the VA hospitals. The United States asserts that "this theory, which is itself suspect, can support a damages award only if the VA's treatment of Mr. Deasy's edema, the sole malpractice alleged, fell below the level of care required of physicians who treat edemas."

8

Brief for Appellant at 13 (citing Armbruster v. Edgar, 731 P.2d 757, 759-60 (Colo. App. 1986), and Muenstermann, 787 F. Supp. at 520-21).

The United States then argues that its witness, Stuart Linas, M.D., a board certified internist and nephrologist who testified that the VA hospitals treated plaintiff properly for edema, was the only expert qualified to testify on the standard of care for treating edema. The United States asserts that plaintiff's psychiatrists were not qualified to offer an expert opinion on the standard of care for edema because that condition lies outside their specialty, see Greene v. Thomas, 662 P.2d 491, 493-94 (Colo. App. 1982) ("expert witness must have acquired, through experience or study, more than just a casual familiarity with the standards of care of the defendant's specialty"); Smith v. Pearre, 625 A.2d 349, 359 (Md. App.) (physicians testifying outside of own specialties must "have sufficient knowledge, skill, and experience to make a well-informed opinion"), cert. denied, 632 A.2d 151 (1993), and that the record does not support a finding that the VA hospitals' treatment of plaintiff's edema constituted malpractice. We disagree.

Psychiatric experts asserted that the VA psychiatrists' failure to provide medical treatment for plaintiff's edema, or to refer him to specialists for such treatment, fell below the standard of care for psychiatrists. See I Supp. App. 188-89, 192 (Dr. Rewey); see also II Supp. App. 278-85 (William McCaw, M.D.) (giving opinion that if edema was treated plaintiff's psychotic episode would perhaps be reduced); id. at 347-56 (John L. Wiberg, M.D.) (stating that plaintiff's edema would affect his brain, resulting in psychotic

9

behavior; and that "immediate medical consultation" should be sought by treating psychiatrist). Of course, under both Maryland and Colorado law a psychiatrist can testify to the standard of care for psychiatry. Plaintiff relied upon psychiatric experts' testimony that it was a breach of the psychiatric standard of care to fail to refer plaintiff to an internist or nephrologist for further evaluation of his edema, and that the failure to do so increased his psychiatric symptoms. This evidence supports the district court's malpractice finding. The failure to treat or refer plaintiff while he was in the Maryland VA continued for over a week. The failure to treat plaintiff's edema upon his admission to the Colorado VA appears less egregious because he was scheduled to be seen the next day by a specialist. Nonetheless, plaintiff's experts testified that the Denver VA psychiatrists should have evaluated and treated plaintiff's edema immediately. This conclusion is supported by testimony by Dr. Simpson, an internist, that immediately after leaving the Denver VA, plaintiff had one of the worst cases of edema that he had seen, requiring hospitalization. Although the United States presented evidence that the VA did not breach its duty of care, the district court's finding to the contrary is supported by the record.[2]

III

---

[2] The district court also noted that although some of defense experts asserted that plaintiff should have received medication for his bipolar disorder, he did not. App. 55-56.

The United States asserts that the district court erred in awarding plaintiff damages in the form of lifetime free medical and psychiatric care. Furr v. AT&T Technologies, Inc., 824 F.2d 1537, 1548 (10th Cir. 1987). The amount of damages is a finding of fact that we uphold unless clearly erroneous. See Fed. R. Civ. P. 52(a). The United States points out that although the plaintiff "is entitled to be compensated for losses attributable to the injury inflicted . . . it is only the damage flowing legally from the defendant's misdeeds which counts." Brief for Appellant at 22 (quoting Westric Battery Co. v. Standard Elec. Co., 482 F.2d 1307, 1318 (10th Cir. 1973)). It argues that lifetime medical care is not compensation for injuries caused by failure to coordinate plaintiff's care or any delay in treating plaintiff's edema; also that if the district court based its award on a finding that plaintiff would continue to receive improper care from the VA in the future, the ruling is too speculative to support a damage award.

The district court, however, specifically found that the VA's malpractice caused plaintiff to suffer from a recurrence of PTSD. This finding is supported by the record. See, e.g., I Supp. App. 170-94 (psychiatrist testified that the VA's treatment of plaintiff in December 1989 to January 1990 caused flare-up of PTSD). The district court found that the PTSD itself arose out of his years of improper treatment.

> [It] has evolved to the point where his reaction to medical maltreatment has become a separate and distinct psychiatric problem--namely post-traumatic stress disorder. Once triggered, this disorder exacerbates whatever psychosis may be presenting at the same time. If not treated for his Ormond's disease and its resulting problems, Mr. Deasy becomes so distrustful,

11

anxious, and enraged that he literally is unable to cooperate with treatment being offered.

App. 51. The basis of the district court's decision to award a sum of money to permit plaintiff to receive the future care he would need outside the VA system was that "the medical testimony establishes that after decades of substantial treatment, [plaintiff's] well-founded fear of maltreatment in the V.A. system actually causes or precipitates serious psychiatric problems." Id. at 63. We cannot find this conclusion clearly erroneous.

The award here is very substantial. But plaintiff was entitled to lifetime free care in government hospitals; he has extremely serious physical and mental illnesses. Both Maryland and Colorado recognize the "thin skull" rule: "a tortfeasor must accept his or her victim as the victim is found." Schafer v. Hoffman, 831 P.2d 897, 900 (Colo. 1992). Compensation for loss of medical services would not, of course, be appropriate merely because a plaintiff disliked the care provided by the VA; however, this is a rare case in which plaintiff produced expert testimony supporting a finding that, due to the VA's own negligence, further treatment in a VA hospital would result in recurrence of his PTSD. The district court's award of damages thus serves to make plaintiff whole. See Ballow v. PHICO Ins. Co., 878 P.2d 672, 677 (Colo. 1994) ("[c]ompensatory damages are awarded in order to make the injured party whole").

The United States did not object in the district court to awarding damages in the form of a trust, with any sums remaining at plaintiff's death reverting to the government.

12

This ensures that plaintiff does not receive a windfall. We have approved reversionary trusts in FTCA cases involving large awards for future medical needs. See Hill v. United States, 81 F.3d 118 (10th Cir.), cert. denied, 64 U.S.L.W. 3780 (U.S. Oct. 7, 1996); Hull v. United States, 971 F.2d 1499 (10th Cir. 1992), cert. denied, 507 U.S. 1030 (1993). We perceive no error in this aspect of the district court's award.

IV

Finally, the United States argues that the $600,000 noneconomic damages awarded by the district court were excessive. We review the award of noneconomic damages for clear error, to determine whether "the award shocks the judicial conscience." Miller v. United States ex rel. Dep't of the Army, 901 F.2d 894, 897 (10th Cir. 1990). Based on the extent of plaintiff's physical and emotional injuries he sustained as a result of the VA's malpractice, we cannot conclude that these noneconomic damage awards were excessive.

AFFIRMED.